James F. TOAL, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 253, Docket 34535.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1970.

Decided Feb. 10, 1971.

Morton Hollander, Washington, D. C. (William D. Ruckelshaus, Asst. Atty. Gen., Stewart H. Jones, U. S. Atty. Conn., Robert V. Zener, and Donald L. Horowitz, Dept. of Justice, Washington, D. C., on the brief), for defendant-appellant.

Alfred S. Julien, New York City (Helen B. Stroller, New York City, on the brief), for plaintiff-appellee.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This appeal concerns the single issue of whether or not plaintiff's medical malpractice claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) was barred by the two-year limitations period specified for such actions in 28 U.S. C. § 2401(b). The district court held that the action was timely commenced. We affirm.

The facts present an extraordinary compounding of mishaps. In 1951 plaintiff Toal underwent spinal surgery to remedy injuries incurred during his military service. Ten years later, while plaintiff was on vacation in Austria, his spinal condition worsened and a second operation was recommended. Plaintiff returned to the United States and was admitted to the Veterans Administration Hospital at West Haven, Connecticut early in May, 1962. On May 23, 1962, Dr. John Elliott and a radiologist performed a myelogram on the plaintiff. This diagnostic procedure involved the introduction of an iodized radiopaque contrast medium, called pantopaque, into plaintiff's spine by means of a lumbar puncture. As the dye circulated through the spinal fluid, X-rays scanned the spinal column. When the filming was completed, the table upon which the patient lay was tilted to permit the pantopaque to collect in the lumbar sac, from which, in the course of customary practice, the dye was then aspirated through a needle. In plaintiff's case, however, the pantopaque was not removed from the plaintiff's spine. Dr. Elliott attempted to withdraw the pantopaque but failed, and no further efforts were made to extract it.

The plaintiff was aware of this at the time and testified that on the day before his discharge he asked Dr. Elliott whether the retained pantopaque might prove harmful. Dr. Elliott assured the plaintiff that pantopaque retention would not injure him, that "we normally leave it [the pantopaque] in; it's standard procedure in * * * a lot of hospitals," that the dye would in time be absorbed and that the plaintiff "had nothing to worry about."

Four days after the plaintiff's discharge on May 31, 1962, he was in an automobile accident, as a result of which he suffered head, neck and back injuries and was hospitalized at another Veterans Administration hospital. Upon his discharge two months later the plaintiff consulted his private physician, Dr. Smith. Because Dr. Elliott had not not-

ed the pantopaque retention in plaintiff's West Haven discharge report until sometime after Dr. Smith's examination, the doctor was not apprised of that crucial fact from his examination of the plaintiff's medical history and therefore assumed that plaintiff's persistent ill-health resulted from the injuries which he had incurred in the automobile accident. Dr. Smith's medications did nothing to alleviate the plaintiff's pain. Toal returned to Austria in February, 1963 where he consulted the same doctors who had recommended the second spinal operation.

On March 29, 1963 plaintiff wrote to the Veterans Administration in an effort to secure larger disability payments.[1] He explained that at the time of the accident he was still suffering from the myelogram taken at the Veterans Administration Hospital at West Haven only 12 days before, which had resulted in more spinal irritation, pain and disability than had an earlier myelogram,[2] and that the aggravating injuries from the automobile accident made his disability complete.

During the ensuing year the plaintiff suffered headaches which grew progressively more excruciatingly painful and were accompanied by dizziness and nausea. In early 1964 an Austrian neurologist, Dr. Strasser, X-rayed the plaintiff's skull and on March 7, 1964 he advised the plaintiff that pantopaque globules encysted on brain tissues were the primary cause of his illness.

The Government contends that the plaintiff's suit, instituted July 27, 1965, was not timely commenced because the plaintiff's letter of March 29, 1963 demonstrated his awareness of the panto-

paque retention and of a spinal irritation which he attributed to the presence of pantopaque. The district court disagreed, finding that the plaintiff did not know and could not have known before March, 1964 the causative relationship between the pantopaque retention and the eventual inflammation of brain tissues which the court found to be a substantial factor in producing the plaintiff's injuries. Plaintiff's letter of March 29, 1963 mentioned the pantopaque retention and spinal irritation in connection with the time of the accident which was four days after his discharge from the West Haven V. A. Hospital when he could fairly assume that the pantopaque had not, in accordance with Dr. Elliott's prognosis, as yet been absorbed. Toal referred to it as a source of discomfort to him at the time but he said nothing to indicate that he was aware he had suffered injury from a wrongful act on the part of the doctor.

The two-year period within which a tort claim action may be brought against the Government is computed from the time the "claim accrues." 28 U.S.C. § 2401(b). By employing this phrase, Congress adopted a concept, developed in the substantive law,[3] embodying those occurrences which permit maintenance of a claim. See Developments in the Law—Statutes of Limitations, 63 Harv.L.Rev. 1177, 1200 (1950). Although many jurisdictions provide that the limitation period, within which a plaintiff with a negligence claim may bring his action, commences to run with the occurrence of the act or omission giving rise to the claim, the federal courts have held that in medical malpractice actions against the Govern-

---

1. After undergoing surgery in 1951, the plaintiff received a 60% disability compensation award from the Veterans Administration. The trial court found the plaintiff was totally disabled after his 1961 relapse but the Veterans Administration did not increase his disability allowance.

2. In January, 1961 Austrian doctors had performed a myelogram using a water-soluble dye.

3. Federal law determines when a "claim accrues" within the meaning of § 2401(b). Kossick v. United States, 330 F.2d 933, 935 (2 Cir.), cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964).

ment the limitation period does not begin to run until "the claimant [has] discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." Quinton v. United States, 304 F. 2d 234, 240 (5 Cir. 1962); see Urie v. Thompson, 337 U.S. 163, 169, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); Kossick v. United States, 330 F.2d 933, 935 (2 Cir.), cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964); Brown v. United States, 353 F.2d 578 (9 Cir. 1965).

Under the peculiar circumstances of the present case we do not find clearly erroneous the district court's decision that the plaintiff could not reasonably have been expected to associate the known retention of pantopaque with the symptoms caused by the gradual encystation of pantopaque on the tissues of his brain, because, although Toal knew that the pantopaque had not been removed, he had been assured by Dr. Elliott that pantopaque retention was not only not an exceptional occurrence but was a customary procedure, that it was not injurious and that he needn't worry about it. Giving full faith to his doctor's confident prognosis, Toal thought it was the unfortunate occurrence of the injuries from the automobile accident so soon after the myelogram at the West Haven V. A. Hospital that prolonged his acute discomfort.

But for Dr. Elliott's assurances to the plaintiff and his failure to record the pantopaque retention until it was too late, plaintiff's private physician would have been apprised of this condition[4] and would have been less likely to have been misled into concluding that the collision-incurred injuries were the cause of plaintiff's suffering. Finally, the letter of March 29, 1963 does not reveal, as the Government contends, the plaintiff's awareness that he was suffering the injurious consequences of maltreatment. Rather it sets out his belief that the presence of pantopaque within the spinal column, the strain of the myelogram procedure and the pre-existing spinal injury made him more vulnerable to suffering from the injuries he received in the automobile collision.

Under the particular circumstances of this case the plaintiff could not reasonably be expected to have distinguished the deleterious effects of the maltreatment from his original service connected disability or from the expectable consequences of proper treatment until the extremely severe symptoms compelled him to seek relief from Dr. Strasser in March of 1964. This is not to say that one who knows he has suffered damage from medical malpractice may postpone bringing an action until the full extent of that damage is ascertained, cf. Ashley v. United States, 413 F.2d 490 (9 Cir. 1969); but in this case Dr. Elliott's assurance that the pantopaque would do him no injury and that it would gradually be absorbed into his system, and Dr. Elliott's delay in filing a notation in the record that the pantopaque had not been removed, so that Toal's private physician, Dr. Smith, knew nothing about it, prevented Toal from learning that any act of malpractice had occurred. Glus v. Brooklyn Eastern Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). The situation was further complicated by injuries from the automobile accident a few days later. Under the circumstances we do not think the trial court clearly erred in finding that until March 1964 plaintiff neither knew of his wrong or failed to exercise reasonable diligence to discover it.

The judgment of the district court is affirmed.

---

4. Plaintiff's medical expert testified that pantopaque would have reached the plaintiff's brain within ten days after its injection.