Monique G. CARON et al.,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 76–1194.

United States Court of Appeals,
First Circuit.

Argued Sept. 8, 1976.

Decided Dec. 23, 1976.

Everett C. Sammartino, Asst. U. S. Atty., Providence, R. I., with whom Lincoln C. Almond, U. S. Atty., Providence, R. I., was on brief, for defendant-appellant.

John F. Dolan, Providence, R. I., with whom Leonard A. Kiernan, Jr., Providence, R. I., was on brief, for plaintiffs-appellees.

Before COFFIN, Chief Judge, CLARK, Associate Justice, U. S. Supreme Court (Ret.),* CAMPBELL, Circuit Judge.

Mr. Justice CLARK:

Ernest Caron and his wife, Annette, brought this medical malpractice action against the United States on behalf of themselves and their twelve-year-old daughter, Monique, under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. The case was tried to the court without a jury, and the District Judge found that while the Carons were stationed at the Custer Air Force Base in Battle Creek, Michigan, on August 12, 1963, Monique, then a normal four-month-old baby, was negligently given immunization injections, by an airman stationed at the Base dispensary, consisting of diphtheria, pertussis and tetanus shots (DPT), oral polio serum and typhoid shot, adult dose.

The shots brought on convulsions and have resulted in Monique having continual *grand mal* seizures, permanent mental retardation of marked severity with disturbed behavior and a very guarded outlook; together with the mentality of a four and one-half-year-old child. The Court awarded the parents $49,280 and Monique $656,326.00.

The Government raises three points of error: (1) The cause of action was not brought within two years of the time that it accrued under 28 U.S.C. § 2401(b); (2) the Carons did not sustain the burden of proving the Government was negligent; and (3) the damage award is not supported by the evidence and is excessive. We affirm the judgment. The District Judge has filed two detailed opinions, one on liability and a subsequent one on damages, both reflecting careful and prudent consideration and obviating the necessity of a full-dress opinion here. We therefore go immediately into our consideration of the claimed errors.

1. *The Carons' claims were barred on 28 U.S.C. § 2401(b):*

■ (a) We start with the proposition that the Federal Tort Claims Act itself provides that the Carons' causes of action must be filed "within two years after such claim accrues." In determining when the Carons' claims accrued, the trial judge applied the law of Michigan, following a decision of the First Circuit in *Tessier v. United States*, 269 F.2d 305 (1959) and *Portis v. United States*, 483 F.2d 670 (4th Cir. 1973). He found that Michigan followed the "discovery rule," under which the cause of action accrues when the malpractice is discovered or in the exercise of reasonable diligence should have been discovered. *Dyke v. Richard*, 390 Mich. 739, 747, 213 N.W.2d 185 (1973). The Government urges us to ignore *Dyke* as violative of the separation of powers doctrine. The short answer to this is that separation of power principles do not apply to the States, cf. *Dreyer v. Illinois*, 187 U.S. 71, 84, 23 S.Ct. 28, 47 L.Ed. 79 (1902), and under *Erie v. Tomkins*, 304 U.S. 64, 58 S.Ct.

817, 82 L.Ed. 1188 (1938), we cannot second-guess the interpretation of the Michigan Supreme Court. The Government urges that we apply federal law citing cases in six circuits.[1] However, our examination of these cases reveals that Michigan and federal law are identical on the point, each applying the "discovery rule." We, therefore, hold that the District Court was correct in applying the "discovery rule."

(b) The Government admits that the alleged act of malpractice occurred on August 12, 1963 when the combination of the DPT, oral polio serum and typhoid shots were administered to Monique at the Air Force Base dispensary. The trial court found that the Carons did not discover the cause of the convulsions until 1973 when they enlisted the assistance of Dr. Yazbak, Monique's doctor from 1965–1972, in placing Monique in the Ladd School, a Rhode Island state institution for the mentally retarded. He was able to secure from the Air Force the medical records of the Air Force Base dispensary, which were previously unobtainable, and those of the Leila Post Montgomery Hospital at Grand Rapids, Michigan, where Monique had been hospitalized for a week in February 1964. Upon examination of these records, Dr. Yazbak concluded that the combination of the DPT, oral polio and typhoid shots was the cause of Monique's convulsions. He so advised Mrs. Caron on November 21, 1973. Claim was thereafter made to the Air Force on January 18, 1974, and suit was filed on May 31, 1974.

 In reviewing the District Judge's finding that the Carons did not discover the cause of Monique's condition until 1973, we must consider the entire record in this case. We must reverse if we are left with a definite and firm conviction that the trial court erred in its finding. See *United States v. U. S. Gypsum*, 333 U.S. 364, 395–399, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Here, our review of the record persuades us that no mistake was made.

However, the Government insists that the Carons had always questioned whether 'the shots' caused Monique's condition . . . As early as February, 1964, the Carons had related to a physician that 'the shots' possibly had caused Monique's convulsions.

It supports this statement by Exhibit 9 of the records of the Leila Post Montgomery Hospital.

However an examination of Exhibit 9 shows that the Government has outspoken itself. It has totally ignored the report of Dr. Levy dated February 2, 1964, on the third page, entitled "Physical Examination", where the doctor finds:

Impression: Convulsive seizure. Cause *undetermined.* (Emphasis supplied)

The Government has also overlooked the glaring omission in all of the medical reports of the Leila Post Montgomery Hospital (Exhibit 9) that Monique was also given an adult shot of typhoid serum at the same time that she received the DPT and oral polio immunization on August 12, 1963. All of the medical testimony emphasized that it was the combination of shots that caused the convulsions and subsequent brain damage to Monique. As Dr. Peter testified:

With respect to the DPT which the child received in the normal dosage I would say there was no obvious negligence; however in the case of typhoid I think this was gross negligence.

It was Dr. Goulet, the Custer Air Force Base physician, who examined Monique on August 12, 1963, soon after the immunization was given. He found:

Patient convulsed in grand mal fashion for almost forty five minutes . . . Examination essentially negative . . Presumed this is a febrile convulsion secondary to typhoid inoculation.

It was the Custer Air Force Base Dispensary that arranged for Monique to be admitted to the Leila Post Montgomery Hospital on February 1, 1964 for "investigation."

---

1. *Quinton v. United States*, 304 F.2d 234 (5th Cir. 1962); *Toal v. United States*, 438 F.2d 222 (2nd Cir. 1971); *Tyminski v. United States*, 481 F.2d 257 (3rd Cir. 1973); *Portis v. United States*, 483 F.2d 670 (4th Cir. 1973); *Kington v. United States*, 396 F.2d 9 (6th Cir. 1968); *Ashley v. United States*, 413 F.2d 490 (9th Cir. 1960).

However, it failed to advise the hospital that Monique had been given an adult shot of typhoid along with the DPT and polio vaccine on August 12, 1963.

It is true that Exhibit 9 also relates: "The mother states that the post convulsive seizures began with the first DPT injection". But this is not to say that the DPT shots caused the convulsions. Indeed, in the whole record, not a single doctor diagnosed the convulsions as stemming from the inoculations. Even Dr. Goulet, the sole witness for the Government, testified that he thought that it was a febrile convulsion, benign type. He assured the Carons everything would be all right. On August 29, 1963, when Mrs. Caron advised Dr. Goulet that she was going to take Monique to a private physician, again he assured her that she was going to be all right; that there was no need for her to consult a private physician; consequently she did not further press her request for the Dispensary records. Significantly those records include a report from Dr. Goulet covering the August 29th visit as follows:

Mother quite hostile and blames change in child's eating behavior on recent convulsive episode. Belligerent Mother wants records.

Not only did Dr. Goulet persuade Mrs. Caron not to secure a private physician, but Mr. Caron's Commanding Officer had him report to the Commander's office where Monique's condition was discussed, and the Commanding Officer told Ernest, "Don't worry about it, everything is alright." Furthermore, in December 1963, when the Carons were going to visit their parents in Rhode Island for Christmas, Dr. Goulet arranged for them to see Dr. Julius Stoll, a neurosurgeon in Rhode Island. The doctor gave Monique a careful examination on December 21, 1963. He was advised of the typhoid shot given Monique along with the DPT and polio vaccine; still his findings were negative. He declared her normal. The only "clinical clue" as a possible causation that he could find "are the skin lesions" which he found over her left tibial region and over the scalp and neck. These he said, "might be present on brain as well as a possible cause." And Dr. Goulet, when asked on cross-examination his reaction to the Stoll report, testified:

Well, we continued to be concerned but we were somewhat mortified by the fact that he didn't think that there appeared to be any extraneous cause, that this fell into a large category of seizures of unexplained etiology.

The record shows that despite all of these negative medical findings, the Carons continued to take Monique to a score or more of private doctors who had Monique admitted to a half dozen different hospitals, all of whom were told by the Carons that the onset of the convulsions was soon after the combination DPT, polio vaccine and typhoid shots. But at no time did the Carons state that this was the cause of the convulsions. Still not one doctor was able to advise what caused the convulsions nor how they might be stopped.

Our review of all of the material leads us to conclude that the rub here is not the nature and extent of Monique's injury but what caused it. The Government maintains that:

it would seem highly unreasonable that anyone would not associate the inoculations with Monique's convulsions.

The short answer to this is that no doctor, no hospital, no person has done so. Even Dr. Goulet described the convulsions back in 1963 as benign. How could a benign convulsion cause all of this brain damage? He also told Mrs. Caron that he did not know the cause. Moreover the Leila Post Montgomery Hospital's findings were negative; Dr. Levy said he did not know the cause; Dr. Griffith told Mrs. Caron he did not know the cause but that Monique would never be the same; Dr. Stoll, in 1963, found Monique to be a normal child. And, furthermore, not a single doctor—including Dr. Goulet—denied telling Mrs. Caron that he did not know the cause of the convulsions. One can hardly say that the conclusions of all of these doctors and hospitals were unreasonable ones. On the contrary, each of the findings were made after examination

and hospitalization, sometimes for weeks at a time.

The case seems very similar to a Fourth Circuit one, *Portis v. United States*, 483 F.2d 670 (4th Cir. 1973). There the court found that there was a "distinct possibility" that the parents of a fourteen-month-old child given a muscular injection of Neomycin might know that the child would have a hearing loss. Still, the court found, that "knowledge and testimony to that effect is scarcely enough to go to the finder of fact on the question of causation." At 673. And the court went on:

> What is important here is that no one, neither layman nor doctor, diagnosed the hearing difficulty as being caused, or even probably caused, by the 1963 malpractice until the year 1969.

Nor did the court in *Portis* find important either the fact that at the time of the malpractice in 1963, the mother was advised to have the child's hearing checked every 21 months or the fact that the mother was informed over the next several years "that deafness could have been caused by ear infections, high fever, or the Neomycin injections." Id. at 671. The court stressed that "none of the physicians who examined and treated [the child] . . . diagnosed the cause of the hearing loss." Id. The similarity of *Portis* to our case is unique. From the evidence here—undisputed on the specific point of limitations—we find that the reliance the Carons placed on the various medical opinions that were unable to connect the convulsions with the inoculations was fully justified and that their action was not barred.

2. *The Negligence of the Government Doctors*:

The Government maintains the Carons failed to prove that the Government doctors did not use that degree of diligence and skill ordinarily exercised by the average physician in the same locality [Michigan] and that the injury resulted from the treatment rendered by the Government physicians. Under this record we find the claim to be frivolous. All of the doctors testified that the combination of the inocu-

lations—an adult dose—given this 4-month old baby was universally condemned by the medical literature as well as the experience of the doctors themselves. Typhoid shots, they testified, should never be given a 4-month old baby except in those situations where the child will be going to a country which is experiencing that disease. And even in those cases a medical history should be taken before injection. This was not done here. The record also shows that there was no typhoid in Michigan or anywhere else in the United States in 1963, and the Carons were not scheduled for foreign service.

It is true that all of the doctors testifying for the Carons practiced outside of Michigan. However, Dr. Peter was a graduate of Harvard College and of Dartmouth Medical School and was qualified as an expert in pediatrics, infectious disease, with training in immunology. He testified that "the indications for typhoid vaccine in Michigan are the same as those throughout the United States, any state." He testified further that "at the time of Monique's injections there was no known typhoid in Michigan; there were no known household contacts and there was no planned travel to any typhoid endemic area". There was no testimony to the contrary. We find this testimony quite sufficient here.

3. *The Damages*:

The Government does not object to the award made to the parents, Ernest and Annette Caron. But the Government does contest the amount of the award allowed their child, Monique. The Government contends that the award of $317,550 for pediatric nursing home care from age 21–50 years, which was reduced to present value and included as part of the total damages award of $656,326, is against the weight of the evidence and speculative. We believe this amount calculated at a $10,950 annual rate to be quite reasonable. However, the Government asserts that two of the Carons' witnesses, Miss Cole and Dr. Denhoff, testified that the institutionalized care at Crystal Springs (where they recommended Mo-

nique be placed from age 13–21 years) was designed with the hope that Monique would become self-sufficient and be able to maintain herself at a facility such as Crystal Springs or at her parents' home. The Government admits that neither of the witnesses stated with any degree of certainty that this result would ever be achieved. Hope springs eternal but, as we all know, it tells a flattering tale. This record gives any such hope no succor whatever. While Dr. Denhoff, a specialist in pediatric neurology, testified that should the convulsions cease or be controlled, there would be no need to institutionalize Monique from age 21–50 years, but, he added, that he doubted that this would ever occur. It can hardly be disputed that a record reflecting a dozen years of continuous grand mal seizures; a finding of permanent mental retardation of marked severity; with disturbed behavior and a very guarded outlook; and at age 12 years a mentality of a four to four-and-one-half-year old child, affords Monique little hope of self-sufficiency. We find that the record, rather than being speculative, speaks out with both substantial weight and credibility, fully supporting the findings.

■ The Government also attacks the award of $30,251.00 for loss of earnings. It says that the award is purely speculative, citing the difficulty found in computing the earnings of an infant. It ridicules the evidence offered by the Carons contending there was no evidence that Monique would have ever "gone to work." But as the Supreme Court of Michigan said in *Purcell v. Keegan*, 359 Mich. 571, 103 N.W.2d 494 (1960), "we do not preclude recovery for lack of precise proof. We do the best we can with what we have . . . Particularly is this true where it is the defendant's own act or neglect that has caused the imprecision." Also see, *Sadlowski v. Meeron* 240 Mich. 306, 215 N.W. 422 (1927), where the same identical problem was resolved in favor of an eleven-year old boy. Monique cannot be blamed for not being able to prove the exact amount of such loss. Here the court allowed less than $1000 per

year loss of earning capacity which certainly is no bonanza for her. Indeed, an eight year old boy was awarded $87,500 by the Sixth Circuit. *Pierce v. New York Central Railroad Company*, 409 F.2d 1392 (6 Cir. 1969). Further, we see no reason to distinguish between the sexes, as the Government indicates.

■ Finally, the Government contests the $500,000 award for pain and suffering contained in the total judgment. It cites *Tinnerholm v. Parke Davis & Co.*, D.C.N.Y., 285 F.Supp. 432, aff'd 411 F.2d 48 (2d Cir. 1969), where a $400,000 pain and suffering award was entered. The Government urges that we compare the award here with those in other cases. While we believe that the better practice is to make the award in a particular case on the basis of the facts and circumstances of that case, we note that some cases have allowed pain and suffering awards over twice as large as was awarded here. We need only cite *Griffin v. United States*, 500 F.2d 1059 (3rd Cir. 1974), where the plaintiff, as a result of ingesting oral live polio vaccine, under a program sponsored by the Government, was permanently rendered a quadriplegic. The district court there awarded $1,200,000 to the plaintiff for her pain and suffering. On appeal, the court stated in affirming the award, "we cannot say that the award was in any way shocking, unfair or biased."

We say here that the findings of the District Court were certainly not clearly erroneous on any phase of this case.

Affirmed.