Edward COLBERT, Individually and as Personal Representative of the Estate of Susan Colbert, Appellant,

v.

GEORGETOWN UNIVERSITY, D/B/A Georgetown University Hospital, and Thomas C. Lee, M.D., Appellees.

No. 91–CV–100.

District of Columbia Court of Appeals.

Argued Jan. 22, 1992.
Decided May 4, 1993.

---

**1246**

Barry J. Nace, Washington, DC, for appellant.

Carolyn H. Williams, with whom David C. Kiernan and Julie Gross Adelson, Washington, DC, were on the brief, for appellees.

Before ROGERS, Chief Judge, and TERRY and SCHWELB, Associate Judges.

TERRY, Associate Judge:

This medical malpractice case presents an issue of first impression in the District of Columbia: whether metastatic cancer can be an "injury," the discovery of which by a plaintiff commences the running of the three-year statute of limitations applicable to malpractice actions. The trial court answered this question in the negative, reasoning that Susan Colbert's discovery of her injury occurred long before her ultimate discovery of metastatic cancer. The court consequently ruled that Mrs. Colbert's claim and that of her husband were barred by the statute of limitations and granted the defendants' motion for summary judgment. We hold that the Colberts' assertion that they did not reasonably believe Mrs. Colbert had been "injured" until she finally learned that her cancer had metastasized raises a genuine issue of material fact, precluding summary judgment.

The trial court granted the defendants' motion for summary judgment on the additional ground that the plaintiffs had not established a *prima facie* case of malpractice. We are satisfied that the defendants' admissions, as set forth in the pleadings, depositions, answers to interrogatories, and affidavits presented by the plaintiffs, establish a *prima facie* case of malpractice. We therefore reverse the trial court's grant of summary judgment on both grounds and remand the case for trial.

I

In July 1982 Susan Colbert felt a lump in her left breast. She went to see her gynecologist, who referred her to an oncologist, Dr. Stanley Kirson. Although a mammogram revealed no evidence of malignancy, a biopsy on August 9 established that the lump was cancerous. Dr. Kirson urged Mrs. Colbert to have the breast removed by a modified radical mastectomy. Because he was about to go out of town, Dr. Kirson gave her the names of two surgeons at Georgetown University Hospital who could perform the operation.

On August 13 Mrs. Colbert and her husband met with Dr. Thomas Lee, one of the surgeons recommended by Dr. Kirson and a full-time employee of Georgetown Hospital. At that meeting Dr. Lee suggested a lumpectomy as an alternative treatment option. He told the Colberts that a lumpectomy was cosmetically more attractive than a mastectomy, and that studies in Europe had shown that, when coupled with radiation treatments afterwards, it was as effective as a mastectomy at removing cancerous cells from the body. The Colberts agreed to the lumpectomy and scheduled the procedure with Dr. Lee.

On August 19 Dr. Lee performed a lumpectomy on Mrs. Colbert's left breast, and at the same time he removed several of her left axillary lymph nodes. When one of the nodes tested positive for cancerous cells, he set up a program of systemic chemotherapy. Mrs. Colbert began receiving chemotherapy treatments under the direction of Dr. Richard Goldberg on September 7.

A couple of weeks later, Mrs. Colbert felt more lumps in her left breast. She tried at that time to get another appointment with Dr. Lee, but she was unsuccessful, so she brought the lumps to Dr. Goldberg's attention. At first Dr. Goldberg did nothing in response to her concerns, but at her last scheduled chemotherapy session on September 28, Dr. Goldberg asked Dr. Patrick Byrne to examine the lumps in Mrs. Colbert's breast. Dr. Byrne arranged for two biopsies to be performed on October 4 and 5.

When these biopsies disclosed the continued presence of cancer in Mrs. Colbert's left breast, Dr. Lee told her that she needed a mastectomy. Mrs. Colbert then asked Dr. Lee if the delay in performing the mastectomy had caused any increased risk. According to her answer to an interrogatory, Dr. Lee replied that "the delay caused enhanced risk of a very high nature." Dr. Lee performed the mastectomy on Mrs. Colbert's left breast on October 21.

Shortly after the mastectomy, Dr. Lee met with Mr. Colbert. At that meeting, according to Mr. Colbert's deposition, Dr. Lee "said that it took him a long time to do the operation because in his entire career he had never seen so much tumor mass." Dr. Lee also said that Mrs. Colbert's chances of survival had decreased from ninety percent to ten percent, and he admitted to Mr. Colbert that he had done "the wrong operation" in August, *i.e.*, when he performed the lumpectomy instead of the mastectomy recommended by Dr. Kirson. Mr. Colbert also stated in his deposition that Dr. Lee said he "had forgotten" that a lumpectomy was not the proper procedure for a patient with multicentric disease, such as Mrs. Colbert.

The next day Mr. Colbert met with Dr. Philip Schein, the chief of the medical oncology division at Georgetown University Hospital, along with other hospital personnel. Dr. Schein told Mr. Colbert that Mrs. Colbert would need an "aggressive" treatment program, combining radiation with chemotherapy. This was "not the usual" treatment after a mastectomy, he said, but because of the extensive growth of the tumor, it was called for in Mrs. Colbert's case. The treatments began very soon thereafter.

Mr. Colbert testified in his deposition that on October 25, 1982, he was in his wife's hospital room when Dr. Goldberg came in. The doctor told them both that he had examined Mrs. Colbert's liver scan and found that the cancer had spread to her liver.[1] He said that Mrs. Colbert should "go home and get [her] affairs in order because [she was] going to die." After more sophisticated tests were run, however, other doctors determined that Dr. Goldberg's reading of the liver scan was in error. There was no liver metastasis, and Dr. Goldberg's conclusion that Mrs. Colbert was "going to die" was wrong. Dr. Goldberg was then taken off her case.

Mrs. Colbert suffered numerous hardships as a result of the chemotherapy and radiation treatment, including third-degree burns, loss of body function, premature menopause,[2] loss of hair, nausea, dizziness, weakness, a cracked bladder and resultant bleeding, blistering, and scars. In addition to these physical problems, Mrs. Colbert became extremely depressed and began seeing a psychiatrist for counseling and treatment.

On March 7, 1983, Mrs. Colbert had a prophylactic mastectomy performed on her right breast. This operation was recommended by the doctors at Georgetown, because they were virtually certain that the cancer would spread to the right breast as a result of what they had found in the left breast. It was performed, however, by Dr. Peter Petrucci at Sibley Memorial Hospital because the Colberts no longer wanted Dr. Lee or anybody else at Georgetown to operate on Mrs. Colbert. In his deposition Mr. Colbert testified that, "based on what the physicians [at Georgetown] told me," he believed the prophylactic mastectomy of the right breast would not have been necessary if a mastectomy of the left breast been performed in August 1982 instead of the lumpectomy.

After the first mastectomy, Dr. Lee and others told the Colberts that they were not sure whether the cancer would recur. Dr. Lee specifically told Mr. Colbert that his wife "may never have a recurrence." Nevertheless, the Colberts received another scare in late 1984 or early 1985, when they were told that the cancer had metastasized

---

1. On this point he disagreed with Dr. Lee, who had read the liver scan as showing "no metastasis." Dr. Goldberg said, "I know that's Dr. Lee's position, but I disagree with him."

2. Mrs. Colbert was thirty-five years old at the time.

to her spine. This proved once again to be a false alarm after further tests revealed no evidence that the cancer had spread.[3]

In late August 1986 Mrs. Colbert began to experience some pain in her lower back. On August 30 she went to see her regular internist, who sent her to Sibley Hospital to have x-rays taken of her back. When the x-rays revealed some evidence of abnormality, the internist told the Colberts that there was a possibility of metastatic cancer and recommended that Mrs. Colbert see an oncologist for further testing. Additional tests were performed by Dr. Fred Smith, who advised her that her cancer had indeed metastasized to her spine and hip. This occurred on September 2 or 3, 1986. From that time onward Mrs. Colbert received treatment for the cancer in her spine, hip, and elsewhere.

Mr. and Mrs. Colbert filed this medical malpractice action on August 31, 1989.[4] After the close of discovery, Dr. Lee and Georgetown University (the defendants) filed two separate motions for summary judgment. One of the motions asserted that the Colberts' claim was barred because it was filed after the expiration of the three-year statute of limitations, D.C.Code § 12–301(8) (1989). The other motion asserted that the various malpractice allegations must fail because they were not supported by expert testimony. The trial court granted the second motion as to all claims except that involving the defendants' alleged failure to warn the Colberts of the risks involved in the lumpectomy procedure initially performed on Mrs. Colbert.[5] That exception was moot, however, because the court also granted the first motion based on the statute of limitations. From the judgment entered for Georgetown and Dr. Lee, the Colberts noted this appeal.

Susan Colbert died on January 4, 1992. Her husband was substituted for her as an appellant in his capacity as the personal representative of her estate. He is also, of course, an appellant in his own right.

## II

Summary judgment may be granted by the trial court if there are no genuine issues of material fact for the jury to decide. Super.Ct.Civ.R. 56(c). "When reviewing a trial court order granting summary judgment, this court makes an independent review of the record." *Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983) (citations omitted). In doing so, we must view the record in the light most favorable to the party opposing the motion and resolve against the moving party any doubts about the existence of a factual dispute. *Brown v. General Motors Acceptance Corp.,* 490 A.2d 1125, 1126 (D.C.1985) (citing cases).

The trial court ruled that, for statute of limitations purposes, there was no genuine issue of material fact as to the date on which the plaintiffs' cause of action accrued. The court also ruled that summary judgment was appropriate because the plaintiffs had not presented or proffered any expert testimony, which in the court's view was necessary for them to establish a *prima facie* case of medical malpractice. We hold that both of these rulings were in error.

### A. *Statute of Limitations*

In the District of Columbia, an action for medical malpractice must be brought within three years "from the time the right to maintain the action accrues." D.C.Code § 12–301(8) (1989). In deciding when a cause of action for medical malpractice accrues for purposes of the statute of limitations, this court has applied the

---

**3.** This second incident did not involve Dr. Lee or any other Georgetown physician. It is relevant to this case, however, because it reinforced the Colberts' belief in the unreliability of preliminary findings of abnormal cell growth.

**4.** Mrs. Colbert sought damages for the alleged malpractice of Dr. Lee and other Georgetown

physicians; Mr. Colbert sought damages for loss of consortium.

**5.** *See Abbey v. Jackson,* 483 A.2d 330, 333 (D.C. 1984) (expert testimony is not required to establish a *prima facie* case on the issue of informed consent).

"discovery rule." *Burns v. Bell*, 409 A.2d 614, 617 (D.C.1979). Under that rule, a cause of action does not accrue until the plaintiff knows, or by the exercise of reasonable diligence should know, of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *Bussineau v. President & Directors of Georgetown College*, 518 A.2d 423, 425 (D.C.1986).

The application of the discovery rule in this case depends on the definition of "injury." Mr. Colbert contends that the metastasis of his wife's cancer is the relevant injury. He asserts that he and his wife were not aware of any injury until they learned definitively that Mrs. Colbert's cancer had metastasized to her spine and hip. The Colberts admitted that they were aware of Dr. Lee's negligence in not performing a mastectomy in August of 1982, but they maintained below, and Mr. Colbert maintains on appeal, that they did not believe that the failure to perform a mastectomy in August of 1982 caused any ultimate harm to Mrs. Colbert until they discovered the metastasis in September of 1986. The hospital and Dr. Lee claim that the relevant injury for purposes of the discovery rule was the initial breast cancer. They assert that the Colberts were aware of that injury and of the defendants' negligence in 1982. Their argument assumes that the metastasis of Mrs. Colbert's cancer was merely a manifestation of that initial, and controlling, injury.

■ The plaintiffs' state of mind is the paramount factor in this court's definition of the relevant injury for purposes of the discovery rule. We have held that, under the discovery rule, "[t]he key issue is [the plaintiff's] knowledge of some injury, its cause, and related wrongdoing." *Knight v. Furlow*, 553 A.2d 1232, 1236 (D.C.1989),

citing *Bussineau, supra*, 518 A.2d at 425. Our cases show that we tend to look askance at trial court rulings that purport to decide such an issue on motions for summary judgment. For example, in *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192 (D.C.1984), we concluded that the relevant inquiry was "whether genuine issues of material fact exist as to when appellant knew, or with reasonable diligence could have known, of the ... defects for which he seeks damages." *Id.* at 1204. We held that "this determination cannot be made in a summary manner.... [Whether] appellant knew or should have known of the alleged defects for more than three years at the time the complaint was filed ... is a question to be decided by the trier of fact." *Id.* (citations omitted).[6]

According to the reasoning of *Ehrenhaft* and *Knight*, the outcome of this case depends on what the Colberts believed (or reasonably should have believed) as to the potential metastasis of Mrs. Colbert's cancer. If the Colberts were reasonable in their belief that they were not injured by the negligence of Dr. Lee until they discovered the metastasis of the cancer in September of 1986, then the cause of action did not accrue until September of 1986. If that belief was not reasonable, then their awareness of injury occurred, and their cause of action accrued, much earlier.[7]

■ In other jurisdictions which apply the discovery rule, a majority of courts confronted with the issue presented here have held that a patient's awareness of metastasis is the relevant trigger for purposes of the statute of limitations. A Florida appellate court, for instance, reversed a trial court's grant of summary judgment on statute of limitations grounds and held

---

6. "Summary judgment is often inappropriate where state of mind is crucial to the ultimate factual issue." *Attorney General v. Irish People, Inc.*, 254 U.S.App.D.C. 229, 233, 796 F.2d 520, 524 (1986) (citations omitted); *see Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

7. In a case factually similar to the case at bar, the Tennessee Court of Appeals held that there was a genuine issue of material fact as to when the plaintiff's cause of action for malpractice

accrued under the discovery rule. "The issue before us is not whether [the plaintiff] knew that she had cancer in July 1987; she admits to having this knowledge. The larger issue is whether she reasonably should have known that the condition would metastasize. If so, her action is barred, otherwise it is not." *Jennings v. Brabson*, No. 1402, 1991 WL 50209, *2 1991 Tenn.App. LEXIS 241, *4 (Tenn.Ct.App. April 10, 1991).

that the plaintiff's assertion that she did not believe she had been injured by the defendants' failure to diagnose her cancer until the discovery of metastasis presented a genuine issue of material fact:

> At the time the radical mastectomy was performed, she had no cause of action against appellee doctor because there was no evidence that his alleged negligence had resulted in any harm to her. It was only in February 1975, when the cancer appeared in other parts of her body, that she discovered her cause of action.

*Johnson v. Mullee,* 385 So.2d 1038, 1040 (Fla.Dist.Ct.App.1980), *review denied,* 392 So.2d 1377 (Fla.1981). The Illinois Appellate Court has similarly held that the reasonableness *vel non* of the plaintiff's belief that she had not been injured until she discovered the metastasis of her cancer was a genuine issue of material fact. *Marciniak v. O'Connor,* 102 Ill.App.3d 381, 386, 58 Ill.Dec. 504, 507, 430 N.E.2d 536, 539 (1981); *see also Catz v. Rubenstein,* 201 Conn. 39, 49, 513 A.2d 98, 103 (1986); *Jennings v. Brabson, supra* note 7. *But see Silverman v. Lathrop,* 168 N.J.Super. 333, 403 A.2d 18 (1979) (plaintiff's cause of action for medical malpractice accrued at the time he discovered the doctor's negligence; upon making that discovery, plaintiff had a duty to investigate whether melanoma spot had metastasized). We find the majority rule consistent with our own case law, and hence we adopt it here for the District of Columbia.

In defining "injury" for purposes of the discovery rule, several courts have explicitly recognized that the metastasis of cancer gives rise to a cause of action distinct from that stemming from the original cancerous injury. The Supreme Court of Arizona has said that "[w]here a medical malpractice claim is based on a misdiagnosis or a failure to diagnose a condition ... the 'injury' is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment." *DeBoer v. Brown,* 138 Ariz. 168, 170, 673 P.2d 912, 914 (1983) (citations omitted). In reversing a trial court's grant of summary judgment in a medical malpractice case, the Illinois Appellate Court defined the relevant injury for purposes of the discovery rule as the metastasis of the original cancer: "The evidence adduced primarily through affidavits and depositions indicates a disputed material fact as to when plaintiff knew or, through use of reasonable diligence, should have known of *her injury, the metastasis of the malignant schwannoma to lymph nodes in her groin.*" *Kaplan v. Berger,* 184 Ill. App.3d 224, 231, 132 Ill.Dec. 461, 466, 539 N.E.2d 1267, 1272 (1989) (emphasis added); *see also Whitaker v. Zirkle,* 188 Ga.App. 706, 708, 374 S.E.2d 106, 108 (1988) ("The injury complained of is the subsequent metastasis of cancerous cells"). In each of these cases, the plaintiff had discovered both the presence of cancer and the negligence of her doctor long before she discovered that the cancer had metastasized. The plaintiff's assertion that it was the discovery of metastasis, rather than the original diagnosis of cancer, that triggered the statute of limitations was viewed to be reasonable enough for jury consideration in each instance.

 The case at bar follows the same pattern. The Colberts admitted that they discovered Dr. Lee's negligence in 1982. They asserted, however, that they did not discover that his negligence caused a compensable injury until the ultimate diagnosis of metastasis in 1986. The affidavits of Mr. and Mrs. Colbert, Mrs. Colbert's answers to interrogatories, and Mr. Colbert's deposition testimony all reflect their belief that Mrs. Colbert had at least a fair possibility of full recovery until she learned of the metastasis. The Colberts' belief that they had not been injured until the manifestation of metastasis was further supported by the evidence that the doctors had consistently told the Colberts that the cancer might be forever cured.[8]

8. The disparity of knowledge between patients and their doctors is one of the main reasons why this court has adopted the discovery rule in medical malpractice actions. "To require a patient to scrutinize to a fine degree the advice given by a treating physician, at the risk of

■ The defendants' assertion that the Colberts were aware of the spread of Mrs. Colbert's cancer before September of 1986 ignores several important facts. It is certainly true that the Colberts were told at least twice before September of 1986 that the cancer had metastasized. But each of these instances ultimately proved to be a false alarm. The record indicates that the presence of metastatic cancer was not conclusively determined until September 2 or 3, 1986;[9] every other supposed discovery of metastasis was tentative or preliminary and was later refuted. Given the significant possibility that breast cancer will metastasize and the relative frequency of the false alarms, the Colberts' belief that Mrs. Colbert was not injured until the ultimate diagnosis may not seem reasonable to a jury. But that belief at least presents an issue of material fact.[10]

■ There are additional reasons to view the Colberts' discovery of metastatic cancer as a clock-starting injury for purposes of the statute of limitations. First, *Ehrenhaft* and other cases[11] make clear that the plaintiffs' interest in the protection afforded by the discovery rule is more compelling than the defendants' interest in not having to deal with stale claims. The resulting obligation to defend which rests on

the defendant is "somewhat tempered by the fact that the burden of proof remains upon the plaintiff." *Ehrenhaft, supra,* 483 A.2d at 1202 (citation omitted). Moreover, it is well recognized that statutes of limitations are merely "statutes of repose," which do not bestow any fundamental right on defendants. Rather, they "find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles." *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). Such statutes can and do remove valid claims from judicial consideration and prevent injured plaintiffs from being compensated for their injuries. Thus, in the application of any statute of limitations, it is the plaintiff's fundamental interest in the adjudication of meritorious claims which must be balanced against the defendant's interest in repose.

Our decision that the discovery of metastatic cancer can start the running of the statute of limitations also obviates the filing of a speculative lawsuit whenever a patient discovers any form of cancer. In *Ehrenhaft* we rested our holding in part on "the interests of judicial economy," concerned that our failure to apply the discovery rule to cases involving latent construc-

losing his right to legal redress, seems unwise." *Burns v. Bell, supra,* 409 A.2d at 617.

9. Appellees assert that the metastasis was conclusively established no later than August 30, 1986. On that date, Mrs. Colbert's internist did inform the Colberts that x-rays of Mrs. Colbert's back were abnormal and suggested the possibility of metastasis—but only a possibility. The internist also recommended further tests, which were not conducted until September 2 or 3. It was those tests that finally confirmed the metastasis of Mrs. Colbert's breast cancer to her hip and spine.

The trial court did not decide whether the preliminary results of the August 30 x-rays satisfied the discovery rule, since it rested its grant of summary judgment on the conclusion that the relevant discovery occurred in 1982. We see no need, however, to remand the case for a specific ruling on the August 30 conversation between Mrs. Colbert and her internist, because we are satisfied that the Colberts' assertion that they did not conclusively discover metastatic cancer until several days later is clearly reasonable enough to raise a genuine issue of fact.

10. Appellees also assert that the Colberts could have sued for malpractice in 1982. The availability of an earlier suit may help the jury to determine whether the Colberts' belief that no injury had occurred was reasonable. But it does not conclusively determine when their cause of action accrued. We reiterate that the relevant focus is on the Colberts' state of mind. Although the Colberts perhaps could have brought this action in 1982, the apparent fact that Mrs. Colbert had fully recovered (which only later turned out to be untrue) may well have led them to believe that they had no viable claim until they discovered that the cancer had metastasized. The possibility of an earlier suit does not make such a belief unreasonable. *See Abboud v. Viscomi,* 111 N.J. 56, 64, 543 A.2d 29, 33 (1988).

11. *E.g., Wilson v. Johns–Manville Sales Corp.,* 221 U.S.App.D.C. 337, 684 F.2d 111 (1982); *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983); *Larson v. Johns–Manville Sales Corp.,* 427 Mich. 301, 399 N.W.2d 1 (1986).

tion defects would "encourage litigation in the first instance, rather than as a last resort." 483 A.2d at 1203 (citation omitted). The United States Court of Appeals in *Wilson, supra* note 11, focused on this same risk in holding that the "manifestation of any asbestos-related disease" does not trigger the running of the statute of limitations on "a separate and distinct disease" caused by the same asbestos exposure "until *that* disease becomes manifest." 221 U.S.App.D.C. at 338, 684 F.2d at 112 (emphasis added). The court noted that if Mr. Wilson had just one indivisible cause of action for all potential consequences of his exposure to asbestos which accrued at the onset of any illness, he would have "a powerful incentive to go to court" at that time with a claim for future damages which would at best be speculative and uncertain, and hence unable to support a damage award. *Id.* at 345, 684 F.2d at 120. The incentive to file claims for unknowable future injuries "would result in the imposition of an unnecessary burden on the judicial system." *Pierce, supra* note 11, 296 Md. at 666, 464 A.2d at 1027.

The interests of judicial economy also support our conclusion in the instant case. If the Colberts' cause of action for all potential injuries had accrued upon their discovery of Dr. Lee's negligence in 1982, they would have been obliged to file speculative claims for any injury which might someday afflict them. Such claims would be very likely to fail and leave the Colberts—or others like them—with no remedy for the metastasis allegedly caused by their doctor's initial negligence. Judicial time and effort would nevertheless be required to reject such claims. Allowing the Colberts to bring suit after they discover the metastasis of cancer provides them with an effective remedy for their alleged injuries.

We therefore conclude that there is a genuine issue of material fact as to when the Colberts discovered their injury. The Colberts have submitted enough evidence

to raise a genuine issue as to that critical question, precluding summary judgment based on the statute of limitations. In applying the discovery rule to the facts of this case on remand, the trier of fact must focus on what the Colberts believed and how reasonable that belief was.

**B. *Expert Testimony***

The trial court also granted summary judgment on the ground that the Colberts had failed to establish a *prima facie* case of medical malpractice, in that they had not presented or proffered any expert testimony in opposing appellees' second motion for summary judgment. Viewing the record in the light most favorable to the Colberts, as we must,[12] we hold that the admissions of Dr. Lee established the requisite *prima facie* case. We therefore reverse the trial court's grant of summary judgment on this alternative ground as well.

To establish a *prima facie* case of medical malpractice, a plaintiff must demonstrate (1) the applicable standard of care, (2) deviation from that standard by the defendant, and (3) a causal relationship between that deviation and the injury. *Meek v. Shepard,* 484 A.2d 579, 581 (D.C. 1984); *Kosberg v. Washington Hospital Center,* 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968). In presenting a *prima facie* case, a medical malpractice plaintiff will usually have to rely on expert testimony, "[s]ince juries composed of laymen are normally incompetent to pass judgment on questions of medical science or technique...." W.P. KEETON, PROSSER & KEETON ON THE LAW OF TORTS § 32, at 188 (5th ed. 1984). We have held, however, that plaintiffs may utilize the expertise of the defendants or their agents and elicit from them the expert opinion necessary to establish a *prima facie* case of malpractice. *Abbey v. Jackson,* 483 A.2d 330, 333–334 (D.C.1984).

When considering a motion for summary judgment, the trial court must review "the pleadings, depositions, answers to interrogatories, and admissions on file,"

12. *E.g., United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962);

*Swann v. Waldman,* 465 A.2d 844, 846 (D.C. 1983) (citing cases).

together with any affidavits offered in support of, or in opposition to, the motion. Super.Ct.Civ.R. 56(c); *see Holland v. Hannan, supra,* 456 A.2d at 815. This rule extends to the admissions of opposing parties. "When one party seeks to use the admissions of an adverse party ... this evidentiary material has by its nature considerable probative value" on motions for summary judgment. 6 J. MOORE, W. TAGGART & J. WICKER, MOORE'S FEDERAL PRACTICE ¶ 56.02[6], at 56–41 (2d ed. 1991) (footnote omitted). Although this quotation from Professor Moore refers specifically to admissions under FED.R.CIV.P. 36,[13] we see no reason why it should not apply to any admissions by an adverse party that may be revealed in an affidavit or a deposition or in answers to interrogatories—as in this case.

 The evidence on which the Colberts relied to establish their *prima facie* case consisted largely of admissions and other oral statements by Dr. Lee. The Colberts both stated under oath that Dr. Lee told them after the first mastectomy in October 1982 that he had made a mistake in not performing that mastectomy two months earlier. Mr. Colbert in his deposition recounted a conversation in which Dr. Lee conceded that he had performed "the wrong operation" in August. Mrs. Colbert said in her answers to interrogatories that Dr. Lee had admitted to her that there was multicentricity present before the August lumpectomy. Dr. Lee told Mr. Colbert the same thing, adding that he "had forgotten" that lumpectomy was not appropriate for a patient with multicentric cancer. Finally, Mrs. Colbert said Dr. Lee had told her that the delay from August to October in performing the mastectomy caused an "enhanced risk of a very high nature, but that only time would tell." [14]

This evidence concerning Dr. Lee's statements to the Colberts must be viewed in the light most favorable to them. We hold that it is sufficient, when so viewed, to defeat appellees' motion for summary judgment. Dr. Lee's admission of negligence demonstrates that the standard of care was breached.[15] His statement to Mrs. Colbert in October 1982 that the delay in performing a mastectomy caused an "enhanced risk of a very high nature, but that only time would tell," provides evidence of causation. In short, the admissions and other statements of Dr. Lee establish a *prima facie* case of malpractice. They may not ultimately be enough to convince a jury that malpractice actually occurred, but there can be no doubt that they raise an issue which must be submitted to a jury. As with the evidence of the Colberts' state of mind in discovering the relevant injury, the Colberts' presentation of a *prima facie* case of malpractice necessitates reversal of the trial court's grant of summary judgment.

### III

We hold that the relevant injury in this case, for the purpose of the discovery rule, is the metastasis of Mrs. Colbert's cancer, not the diagnosis of the original cancer. The Colberts have presented sufficient evidence to establish that they did not reasonably believe Mrs. Colbert had suffered such an injury until September 1986. We hold that whether this belief was reasonable is a genuine issue of material fact, and that summary judgment based on the statute of limitations was therefore erroneously granted. Likewise, summary judgment based on the lack of expert testimony is inconsistent with the admissions of Dr. Lee, which are sufficient to establish a *prima facie* case of malpractice. The Colberts' failure to offer an expert of their own to testify independently about negli-

---

**13.** Rule 36, one of the rules governing discovery, deals with requests for admissions and the effect of such admissions after they are made.

**14.** Dr. Lee stated several times in his deposition that he had no recollection of any conversations with either Mr. or Mrs. Colbert.

**15.** The standard of care was clearly established by several doctors, and all parties agree that it has been demonstrated. Briefly stated, the relevant standard is that a mastectomy should be performed if a breast cancer patient has documented multicentricity.

gence and causation is thus not fatal to their claims.

We therefore reverse the trial court's grant of summary judgment on both grounds and remand this case for trial or for other proceedings consistent with this opinion.

***Reversed and remanded.***

SCHWELB, Associate Judge, concurring in part and dissenting in part:

I agree with the majority that Dr. Lee's alleged admissions to the Colberts were sufficient, even in the absence of expert testimony, to raise a genuine issue of material fact as to whether Dr. Lee and Georgetown were negligent. I likewise have no particular problem with what my colleagues characterize as the "majority rule" in metastasis cases, insofar as that rule provides that the claim arises when the plaintiff knew or should have known that the defendant was negligent and that, as a result of that negligence, metastasis was likely to result. *See, e.g., Johnson v. Mullee,* 385 So.2d 1038, 1040 (Fla.Dist.Ct.App. 1980). That doctrine is consistent with our rule that a medical malpractice claim does not accrue until the patient has "discovered or reasonably should have discovered all of the essential elements of her possible cause of action, *i.e.,* duty, breach, causation, and damages." *Bussineau v. President and Directors of Georgetown College,* 518 A.2d 423, 434 (D.C.1986) (quoting *Ohler v. Tacoma General Hospital,* 92 Wash.2d 507, 598 P.2d 1358, 1360 (1979) (en banc)). I part company with the majority, however, with respect to the application of that rule to the record in this case. In my opinion, the Colberts' claim accrued, at the latest, in 1983, and is therefore time-barred.

I

The facts critical to the issue which divides the court were well stated by Judge Levie in his thoughtful opinion in the trial court. As the judge pointed out, the Colberts were aware in 1982 that the cancer was all but certain to metastasize:

In October, 1982, Dr. Lee informed Ms. Colbert that she needed a mastectomy because the results of the biopsy showed "suspicious cells." (Susan Colbert's Inter.Ans. No. 11). At that time, Ms. Colbert asked him what the result of the delay had been or would be, and Dr. Lee told her that the delay [in performing the mastectomy] caused enhanced risk of a very high nature. (Susan Colbert Inter.Ans. No. 31). On October 21, 1982, after Dr. Lee performed a mastectomy of Ms. Colbert's left breast, Dr. Lee spoke with Mr. Colbert and admitted that he (Dr. Lee) had performed the wrong operation, and that Ms. Colbert's chances of surviving had been greatly reduced. (Edw. Colbert Depo. at 98). Before the operation, Dr. Lee told the Colberts that Ms. Colbert had a 90% chance of survival; after the mastectomy Dr. Lee told Edward Colbert that Ms Colbert had a 10% chance of survival. Basically, Dr. Lee said she was going to die. (*Id.*). At this point, plaintiffs were made aware of Susan's injury (deprivation of her chances of recovery) and that Dr. Lee's conduct constituted possible malpractice.

Memorandum Opinion, at 9.

Moreover, the metastasis which was discovered in 1986 was not by any means the only injury which the Colberts claimed to have incurred as a result of Dr. Lee's and Georgetown's negligence. As Judge Levie explained,

all of the other injuries that plaintiffs allege they sustained as a result of defendants' negligence were sustained and occurred in 1982 and 1983. These injuries as elaborated by Ms. Colbert in her answers to interrogatories are as follows:

Third degree burns resulting from the otherwise unnecessary joint application of radiation and chemotherapy. Loss of body function and pain associated with otherwise unnecessary radiation therapy. Need for prophylactic mastectomy on the right side.... Additional chemotherapeutic and hormone treatment. Continued radiation to control pain and spread of disease. Emotional trauma to self, husband and children.

(Susan Colbert Inter.Ans., No. 30). Mr. Colbert also testified at his deposition that in 1982–83 Ms. Colbert went through premature menopause, suffered nausea, dizziness and loss of hair, her bladder cracked and bled and she became extremely depressed. (Edw. Colbert Depo. at 135–142).

*Id.* at 12.

In their complaint, the Colberts sought to recover for these injuries even though they filed suit more than six years after Mrs. Colbert allegedly suffered them. It is in this factual context that the Colberts' contentions must be considered.

## II

In the cases relied on by the majority, the metastasis of the cancer was apparently the only injury for which the plaintiffs were seeking to recover. None of these decisions involved a situation in which the plaintiff was told, at a much earlier date, that metastasis and death were all but certain. In *Johnson, supra,* for example, the Florida appellate court stated that

> [a]t the time the radical mastectomy was performed, she had no cause of action against appellee doctor because *there was no evidence that his alleged negligence had resulted in any harm to her.* It was only in February 1975, when the cancer appeared in other parts of her body, that she discovered her cause of action.

385 So.2d at 1040 (emphasis added).

In the present case, on the other hand, the Colberts were told in 1982 that the probability of metastasis and early death had increased from 10% to 90% as a result of the defendants' negligence. Moreover, Mrs. Colbert had complained, more than six years before suit was filed, of major injuries and suffering which had also allegedly been proximately caused by Dr. Lee's and Georgetown's malpractice.

These differences are critical and, in my view, dispositive. In order for her claim to have accrued, it is not necessary that Mrs.

Colbert have learned with certainty that her cancer would metastasize as a result of the defendant's negligence. *See Baker v. A.H. Robins Co.,* 613 F.Supp. 994, 996 (D.D.C.1985). Since the Colberts knew in 1982 that there was a 90% probability of metastasis and death, they could have brought suit armed with .that probability, and they would have been entitled to "recovery of damages based on future consequences." *Wilson v. Johns–Manville Sales Corp.,* 221 U.S.App.D.C. 337, 345, 684 F.2d 111, 119 (1982).[1] Assuming that the discovery of metastasis starts the clock running again in a situation where, at the time the plaintiff first knew or should have known of the defendant's negligence, the possibility of such metastasis was at most speculative, such an assumption provides no solace to the Colberts where, as here, Dr. Lee told them in 1982, without contradiction, that there was a 90% probability that the cancer would spread and that Mrs. Colbert would die.

Moreover, as Judge Jackson, applying District of Columbia law, correctly pointed out in *Baker,*

> [t]he fact that she did not then comprehend the full extent of *all* possible sequelae does not matter, for the law of limitations requires only that she have inquiry notice of the existence of a *cause of action* for personal injury.

613 F.Supp. at 996 (emphasis in original; citations omitted). Put another way, "one who knows that [s]he has suffered from medical malpractice may not postpone an action until the full extent of [her] damage is ascertained." *Hulver v. United States,* 562 F.2d 1132, 1137 (8th Cir.1977) (citations omitted), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978); *see also Toal v. United States,* 438 F.2d 222, 225 (2d Cir.1971).

This court has applied, in legal malpractice litigation, the principles articulated in *Baker, Hulver,* and *Toal:*

---

1. "To meet the 'reasonably certain' standard [for future consequences], courts have generally required plaintiffs to prove that it is more likely than not (a greater than 50% chance) that the projected consequence will occur." *Wilson, supra,* 221 U.S.App.D.C. at 345, 684 F.2d at 119.

It is not necessary that all or even the greater part of the damages have to occur before the cause of action arises. *Any appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action* upon which the client may sue.

*Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C.1989) (emphasis added; citations and internal quotation marks omitted). We went on to note in *Knight* that "[t]he key issue is client knowledge of *some injury*, its cause, and related wrongdoing." *Id.* at 1236 (emphasis added).

The Colberts' reliance on *Wilson, supra,* 221 U.S.App.D.C. 337, 684 F.2d 111, is misplaced. In that case, the plaintiff, who had been exposed to asbestos products, developed mild asbestosis in 1973 and cancer in 1978. He died in 1978, and his widow filed suit for wrongful death in 1979. The court held that the one-year statute of limitations began to run with the discovery of the cancer in 1978, rather than with the appearance of mild asbestosis in 1973. The court reasoned that the more serious disease constituted a separate injury which was not predictable in 1973, and that Wilson could not have sought damages for cancer at that time.[2] In the present case, on the other hand, the Colberts had been apprised of a 90% probability of metastasis and death. If they succeeded in proving what they alleged, any argument on behalf of the defense that the claimed damages were too speculative would have been demonstrably unavailing.[3]

The logic of the majority opinion in this case leads to the conclusion that Mrs. Colbert, knowing in 1982 that it was 90% prob-able that her cancer would have metastasized, could nevertheless sue in 1983 for burns, loss of body function, pain, a prophylactic mastectomy, emotional trauma, premature nausea, dizziness, hair loss, a cracked bladder, and severe depression, leave out of her suit any claim for metastasis, and then bring a separate suit in 1987 three years after the 90% probability had become a *fait accompli.* No court, to the best of my knowledge, has ever reached a result like that!

### III

Even if the allegations in the complaint with respect to the metastasis were not time-barred—and I have already expressed my disagreement with this premise—Dr. Lee and Georgetown would be entitled at least to partial summary judgment. I know of no principled argument for maintaining that the Colberts' suit is timely with respect to those injuries which Mrs. Colbert is alleged to have suffered in 1982 and 1983. Counsel for the Colberts virtually conceded as much at oral argument, and there is nothing in counsel's brief contrary to that near-concession.

### IV

As Judge Levie observed in the introduction to his opinion, "this case is a difficult one, evoking much sympathy." If the allegations of the complaint are true, then Dr. Lee was negligent, and the consequences for Mrs. Colbert were disastrous. Moreover, with the adoption and expansion of the discovery rule, *see, e.g., Bussineau, supra,* this court has tempered the rigors

---

**2.** The court pointed out in *Wilson* that only "15% of asbestosis sufferers later contract pleural mesothelioma and 12% contract peritoneal mesothelioma," so that

it is altogether likely that had Wilson, upon receiving the "mild asbestosis" diagnosis, sought to recover for a cancer which might (or might not) develop, Johns–Manville would have argued forcibly that the probability of such a development was far less than 50%, and was therefore too speculative, conjectural, [and] uncertain to support a damage award.

221 U.S.App.D.C. at 346 & n. 45, 684 F.2d at 120 & n. 45.

**3.** Counsel for Dr. Lee and Georgetown contended at oral argument that *Wilson* was incorrectly decided. Nothing in this opinion is intended to lend any support to that view, with which I emphatically disagree. The suggestion that the plaintiff should have lost his right to sue for cancer because he failed to sue for mild asbestosis, when the development of the cancer was not predictable, and when the plaintiff could not have recovered for it if he had brought the suit in 1973, has nothing to do with justice or with judicious statutory interpretation.

of the statute of limitations, and has construed that statute in such a way that the reasonably vigilant plaintiff is accorded a fair opportunity to litigate the merits. We have never gone as far, however, as my colleagues take us today. The Colberts are being excused, in my view, for not asserting their rights in timely fashion after those rights had plainly ripened. From that portion of the majority decision, I respectfully dissent.