KAREN B. KAPLAN, Plaintiff-Appellant, v. DAVID M. BERGER *et al.*, Defendants-Appellees.

Second District   No. 2—88—0366

Opinion filed May 25, 1989.—Rehearing denied July 12, 1989.

Robert W. Karr and Marion A. Morawicz, both of Robert W. Karr & As-

sociates, Ltd., and Sidney Z. Karasik, of Chicago, for appellant.

Lawrence J. Helms and Patricia Mengler Whaley, both of Wildman, Harrold, Allen & Dixon, of Chicago, for appellee David M. Berger.

George E. Riseborough, Jack H. Krackenberger, and Thomas K. Gerling, all of Brydges, Riseborough, Morris, Franke & Miller, of Waukegan, for appellee Highland Park Orthopedic Clinic.

JUSTICE WOODWARD delivered the opinion of the court:

On March 27, 1985, plaintiff, Karen Kaplan, filed a two-count complaint which alleged that defendants, Dr. David Berger and Highland Park Orthopedic Clinic (HPOC), committed medical malpractice by failing to properly diagnose a malignant schwannoma, the result of which was the metastasis of the cancer to plaintiff's groin. She appeals from orders by the circuit court of Lake County which granted defendants' motions for summary judgment. We reverse and remand.

Initially, we address defendant Berger's motion to strike certain portions of plaintiff's reply brief. Specifically, he objects to certain passages of plaintiff's evidence deposition referred to in her reply brief. Defendant Berger argues that plaintiff makes reference to quotations from her deposition transcript which were never raised in the court below. We note that the entire transcript is part of the record on appeal. Defendant cites no authority for his argument and, pursuant to Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)), we find this issue waived.

On May 21, 1986, plaintiff filed an amended two-count complaint against the two defendants. In count I, plaintiff alleged that Dr. Berger failed to conduct a proper and appropriate examination of her right leg when she made an office call in February 1982; that he failed to obtain or recommend an appropriate orthopedic, neurological, or other consultation; and that he failed to admonish her that, based on her family and personal history of cancer, further exploration of those complaints should have been undertaken immediately.

Count I of plaintiff's amended complaint alleged that as a direct and proximate result of Dr. Berger's omissions, the diagnosis of plaintiff's condition of ill-being, namely, the malignant schwannoma or spindelle cell sarcoma, was delayed until April 1983. As a result thereof, plaintiff's surgical and other treatment was greater than it would otherwise have been, and the prognosis for an otherwise normal life expectancy was substantially diminished by the delay in obtaining a proper diagnosis and treatment.

Count II of the amended complaint alleged that on October 13, 1981, defendant HPOC and its staff employees failed to undertake complete and appropriate diagnostic measures to determine the cause of the pain in plaintiff's right leg, which was ultimately diagnosed as a fracture of the fibula; that on February 13 and again on February 14, 1983, defendant failed to undertake appropriate examination and diagnostic measures to determine the cause of plaintiff's right leg complaints; and that it failed to obtain and record a complete family and personal history from plaintiff.

Dr. Berger filed a motion for summary judgment on the ground that (1) plaintiff's cause was barred by the medical malpractice statute of limitations (Ill. Rev. Stat. 1985, ch. 110, par. 13—212) and (2) plaintiff's injury was not proximately caused by Berger's acts or omissions. HPOC filed two separate motions for summary judgment. In the first motion, it argued that (1) plaintiff's cause was barred by the medical malpractice statute of limitations (Ill. Rev. Stat. 1985, ch. 110, par. 13—212), and (2) plaintiff's injury was not proximately caused by services it rendered to her in October 1981 or February 1983. The court below granted both defendants' motions for summary judgment, and this appeal followed.

First, we observe that the purpose of summary judgment is not to try an issue of fact but to determine whether there are any issues of material fact. (*Golden v. Marshall Field & Co.* (1985), 134 Ill. App. 3d 100.) Summary judgment is a drastic measure to be granted only where the evidence, when construed most strongly against the moving party, establishes clearly and without doubt the right thereto. (*Becovic v. Harris Trust & Savings Bank* (1984), 128 Ill. App. 3d 107.) Summary judgment should be awarded with caution so as not to preempt the right to trial by jury or the right to present fully a factual basis for a case when a material dispute may exist. *W.H. Lyman Construction Co. v. Village of Gurnee* (1985), 131 Ill. App. 3d 87.

We first address Dr. Berger's argument that plaintiff waived the issue of proximate causation of the injury and, consequently, this court is required to affirm summary judgment on this ground. Plaintiff argues the issue of proximate causation and whether plaintiff's suit was timely filed are tightly interwoven. We agree. Here, as alleged by plaintiff, Dr. Berger's failure to provide proper treatment (proximate causation) delayed her determination of the true nature of the growth in her leg until April 1983. This omission pushed back the running of the relevant statute of limitations. We find that plaintiff's argument does address both issues. Nevertheless, for the sake of clarity, we will address the issues of proximate causation and statute of

limitations separately.

■ Next, we address plaintiff's argument that her malpractice action was not time barred under the applicable statute (Ill. Rev. Stat. 1983, ch. 110, par. 13—212), which provides in pertinent part:

> "No action for damages for injury or death against any physician *** or hospital *** arising out of patient care shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known *** of the injury or death for which damages are sought *** ."

In *Witherell v. Weimer* (1981), 85 Ill. 2d 146, our supreme court interpreted this provision thusly:

> "The statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. At that point the burden is upon the injured person to inquire further as to the existence of a cause of action." (85 Ill. 2d at 156.)

Plaintiff knows or should know her injury was wrongfully caused when she obtains "sufficient information concerning [her] injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 416.

■ Moreover, in *Witherell,* the court held that in the great majority of cases, the date of discovery by a plaintiff of a wrongfully caused injury will be a disputed question of fact for the jury:

> "In many, if not most, cases the time at which an injured party knows or reasonably should have known both of his injury and that it was wrongfully caused will be a disputed question to be resolved by the finder of fact." (*Witherell,* 85 Ill. 2d at 156.)

Only where a single conclusion is compelled by the evidence can the court decide the question as a matter of law. 85 Ill. 2d at 156.

Dr. Berger is a general surgeon whose practice includes surgical oncology or the surgical management of malignancies. Sometime in 1976, plaintiff came under the care and treatment of defendant Dr. Berger for breast cancer, and subsequently, she underwent a mastectomy. In January 1981, Dr. Berger operated on plaintiff's right thigh to remove a growth, which proved to be benign. Plaintiff continued to see Dr. Berger on follow-up visits through February 1982.

In July 1981, plaintiff's German shepherd ran into her right leg and knocked her over. The resulting pain in her right leg was temporary and subsided. In September 1981, plaintiff noticed that the outer portion of her lower right leg was numb. By October 1981, plaintiff's

lower right leg was very painful, and she felt a lump beneath her right knee. Plaintiff testified that she speculated that her right leg had been broken in the collision with her dog.

On October 13, 1981, plaintiff was examined by Dr. Rosenzweig, an orthopedic surgeon who was associated with defendant HPOC. Plaintiff stated that before seeing Dr. Rosenzweig, she filled out a medical history sheet, but she did not talk with him about her medical history. Plaintiff "thought" that she probably told Dr. Rosenzweig about her mastectomy for breast cancer. She did not recall speaking with him about her family history of cancer. Dr. Rosenzweig made a cursory examination of plaintiff's leg. Plaintiff stated that Dr. Rosenzweig felt a hard mass in her lower right leg. He ordered X rays which were taken of the lower right leg. The X rays did not show any evidence of a fracture. Dr. Rosenzweig referred plaintiff for a series of three ultrasound treatments at Highland Park Hospital. He did not explain the reason for the treatments, nor did plaintiff understand their purpose. Plaintiff stated that on the same day, she went to take the clinic's ultrasound treatment but was told that it was too busy, and she should call back for an appointment. Dr. Rosenzweig did not indicate to her that she was to follow up with him while undergoing ultrasound treatments. Plaintiff testified that he never indicated to her that he would see her again, and she "thought" he was "through" with her.

In January 1982, plaintiff saw Dr. Berger for a routine examination; he detected and removed a lump from her left breast. Because the detection of the lump in her breast and its removal took precedence, plaintiff did not bring the pain in her right leg to Dr. Berger's attention. On February 2, 1982, plaintiff saw Dr. Berger again and described to him the tenderness and occasionally severe pain in her lower right leg. Plaintiff testified that she pointed out the lump to Dr. Berger, whose examination of the right leg was brief. Plaintiff told him about the collision with her dog the summer before. Dr. Berger had plaintiff stand on her toes and walk in a circle. He touched the area beneath plaintiff's right knee and stated that he did not feel or see a lump. Dr. Berger did not order an X ray, nor did he indicate that there was a problem with her leg. At the examination's conclusion, Dr. Berger told plaintiff that he did not take care of legs and told her to see someone else. Dr. Berger did not refer plaintiff to a leg specialist or suggest any names of such specialists. Plaintiff testified that she did not understand Berger's statement that he did not deal with leg problems because he had previously removed a lump from her right thigh.

Plaintiff testified that she "thought" Dr. Berger's examination of February 2, 1982, was inadequate and that she did not believe his findings. In plaintiff's deposition, the following dialogue took place:

"MR. HELMS: Q. From the way that he [Dr. Berger] treated you did you feel that his examination of your right leg was adequate for you to rely upon?

A. No.

Q. And you yourself disbelieved what he said about his findings, is that correct?

A. Correct.

Q. In terms of a mass?

A. Correct. But he being my cancer specialist at the time, when he didn't go crazy over the lump, I didn't see any need to.

Q. I take it that as of February 1982, when you were in the office with him, that you disagreed with him then as well?

A. Yes.

Q. Did you disagree verbally to him?

A. No.

Q. But you felt he was wrong then and there?

A. Yes.

Q. Why didn't you do something further about it then?

A. Because nobody seemed to react like I should be doing anything more than I was doing."

Plaintiff further explained her decision not to immediately seek another opinion regarding her leg:

"Q. When Dr. Berger told you on February 2, 1982, to go see someone else, did you take that to be medical advice?

A. No.

Q. What did you take it to be?

A. I took it to be that the guy was too busy and just decided he knew better than tell me to go see someone else, who took care of legs."

Following the February visit to Dr. Berger, plaintiff's lower right leg pain worsened. Plaintiff testified that in June 1982, plaintiff, while on vacation in Aspen, Colorado, saw Dr. Kirk, an orthopedic surgeon, concerning the problem she was having with her lower right leg. Dr. Kirk ordered an X ray, which he interpreted as showing a healed fracture of the right fibula. Dr. Kirk informed plaintiff that she had a healed fracture and was suffering from arthritis. In examining plaintiff's lower right leg, he did not feel any lump. Dr. Kirk prescribed medication, which did not ease the pain.

Upon plaintiff's return to Chicago in late summer 1982, she called Dr. Berger to give him "one more chance" to address her leg problem. Again, Dr. Berger told her that he did not take care of legs. He did not suggest any leg specialist with whom plaintiff could consult. Plaintiff did not communicate with Dr. Berger again.

In November 1982, plaintiff visited her gynecologist, Dr. Lionel Schewitz, and mentioned to him the severe pain in her right leg. Plaintiff testified that she told Dr. Schewitz that her complaints were being ignored. Plaintiff stated that Dr. Schewitz did not respond to her complaints. She did not ask Dr. Schewitz for a referral.

In February 1983, plaintiff went to Highland Park Hospital's emergency room with excruciating pain in her lower right leg. Plaintiff stated that, at this time, the lump was sticking out from her lower right leg and was the size of a "little golf ball." She initially was examined by Dr. Arnold Cohn, an orthopedic physician associated with defendant HPOC. Dr. Cohn ordered an X ray, and upon reviewing it, told plaintiff that he saw nothing irregular in it. Stating that he could do nothing for her, Dr. Cohn called in Dr. Weber to examine plaintiff. Dr. Weber, who was not associated with HPOC, examined plaintiff's right leg, and he detected a lump and a neuroma, i.e., a tumor made up of nerve cells and nerve fibers. Dr. Weber prescribed several medications, a combination of which reduced plaintiff's pain. Also, Dr. Weber ordered an EMG, the results of which were normal. He then referred plaintiff to Dr. Ivan Ciric, a neurosurgeon, who saw her once in March 1983. Dr. Ciric also thought the growth was a neuroma and referred plaintiff to a nerve specialist in New Orleans, Dr. David Kline. After examining plaintiff, Dr. Kline operated in April 1983 to remove the lump, which he initially thought was a neuroma. A biopsy of the tumor indicated that it was an unencapsulated, malignant schwannoma, which is a neoplasm originating from the schwann cells of the myelin sheath of neurons. Dr. Kline suggested amputation of plaintiff's right leg above the knee. Plaintiff rejected this suggestion.

Upon recuperation from the surgery to remove the growth, plaintiff saw two Chicago physicians, Dr. Dasgupta and Dr. Gitelis in or about May 1983. Dr. Dasgupta wanted to remove the affected nerve, which would have left plaintiff with a nonfunctional right leg. Dr. Gitelis, an orthopedic surgeon, when informed by plaintiff that she did not want her right leg partially amputated, suggested radiation treatment. In or about July 1983, plaintiff received a course of radiation treatment which caused serious deterioration in the skin and muscle in her groin. In August 1983, two weeks after the radiation treatment had been terminated prematurely due to the aforementioned deterio-

ration, plaintiff found enlarged lymph nodes in her groin. These growths were surgically removed by Dr. Gitelis. They were determined to be malignant schwannoma, which had metastacized from plaintiff's right leg schwannoma. Plaintiff underwent a number of plastic surgeries to restore her deteriorated groin.

During the pendency of this lawsuit, plaintiff retained Dr. Donald Sweet, who is board-certified in internal medicine, oncology, and hematology. Paragraph 6 of plaintiff's response to Dr. Berger's motion for summary judgment states that Dr. Sweet, in a deposition which is not part of the appellate record, opined that Dr. Berger deviated from the applicable standard of care, the result of which proximately caused injury to plaintiff in the form of a delay in the diagnosis and treatment of her malignant schwannoma. This delay resulted in the metastasis of the cancer. Dr. Sweet did not criticize the services rendered by Dr. Cohn of HPOC in February 1983. Regarding Dr. Cohn, defendant HPOC offered the affidavit of Dr. Larry Milner, a board-certified oncologist, who opined that Dr. Cohn and HPOC did not deviate from accepted standards of medical care in relation to treatment of plaintiff in February 1983. Dr. Milner did not address the services rendered by HPOC's Dr. Rosenzweig in October 1981.

Plaintiff argues that she was not aware of the true nature and extent of her right leg's ill-being until she underwent surgery in April 1983, when the lump was removed and a biopsy determined it to be malignant.

Plaintiff further points out that it was only in August 1983 when she learned of the metastasis to her groin of the malignant schwannoma. She contends that it was only then that she knew that she had suffered damage as a result of the misdiagnosis. Thus, plaintiff asserts that the correct discovery date is no sooner than the date in August 1983 when she first became aware that the malignant schwannoma had metastasized to her groin.

The evidence adduced primarily through affidavits and depositions indicates a disputed material fact as to when plaintiff knew or, through use of reasonable diligence, should have known of her injury, the metastasis of the malignant schwannoma to lymph nodes in her groin. From our reading of the record, a trier of fact could conceivably find that plaintiff could not reasonably have known the nature of her disease before the biopsy of the growth taken from her right leg was determined to be a malignant schwannoma and that plaintiff could not have reasonably known that the defendants were failing to advise her as to the true nature of her disease.

The record demonstrates that from the time of plaintiff's collision

with her dog in July 1981 until April 1983, the treating physicians' diagnoses and treatments for her right leg condition were conflicting and contradictory. For example in October 1981, Dr. Rosenzweig told her that she had no fracture in her right leg, while Dr. Kirk told her in July 1982 that a fracture in her right leg had healed. Further, no physician correctly diagnosed her condition until the growth was removed and microscopically examined. Dr. Ciric and Dr. Kline, both of whom could readily observe and feel the growth, failed properly to diagnose it, both diagnosing the lump as neuroma.

█▌█ Plaintiff testified that she did not think Dr. Rosenzweig's recommendation for ultrasound treatment made sense, and consequently, she did not follow up on such treatment. She also stated that she did not accept Dr. Berger's evaluation of her leg problem, yet she testified that his failure to respond to the growth in her leg attenuated her resolve to seek further opinions. In either situation, a trier of fact could determine that plaintiff's alleged failure to follow up was based on an uncertainty regarding her condition as reflected in the examination and recommendations, or lack thereof, of Drs. Rosenzweig and Berger. Indeed, given the failure of all plaintiff's physicians to determine initially the existence of the growth and later to diagnose properly the nature of the lump, a trier of fact could determine that plaintiff's actions in dealing with the growth were reasonable. A lay patient is not expected to diagnose or ascertain the nature of a medical condition when her physicians did not diagnose that condition. (*Martinez v. Rosenzweig* (1979), 70 Ill. App. 3d 155.) We find that a trier of fact could determine that the instant cause of action accrued when plaintiff learned of the metastasis of the cancer to lymph nodes in her groin in August 1983 and that plaintiff, who filed her action on March 25, 1985, had commenced this action within the statute of limitations. Consequently, the trial court erred in finding that the statute of limitations barred plaintiff's complaint.

█▌█ In addressing the issue of proximate cause, we initially observe that in a medical malpractice case, plaintiff must prove that it is more probably true than not true that defendant's negligence was the proximate cause of plaintiff's injury. (*Russell v. Subbiah* (1986), 149 Ill. App. 3d 268.) Questions of negligence, due care, and proximate cause are ordinarily questions of fact for a jury to decide and can become questions of law only when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to inferences to be drawn from them. *Thomas v. Northington* (1985), 134 Ill. App. 3d 141.

█▌ The court below, in granting defendant Berger's motion for

summary judgment, found that "[a]ny causal link between Plaintiff's injury and Defendant was broken as a matter of law." The trial court also stated, "When Plaintiff first saw Defendant [Berger] in February 1982 she was told that Defendant could not find a problem, that he would not treat her and she should see another doctor. Plaintiff formed the belief that Defendant's examination was inadequate for her to rely upon, and that she disbelieved his findings." This statement does not accurately reflect plaintiff's deposition testimony, wherein she demonstrated an uncertainty as to what, if anything, to do following Dr. Berger's examination in February 1982. Dr. Berger's statement that he did not "treat legs," when the record plainly shows that he removed a growth from plaintiff's thigh in January 1981, further underscores the causes of her uncertainty as to what course to take. The opinion of Dr. Sweet, a board-certified oncologist, that Dr. Berger's services to plaintiff deviated from the applicable standard of care further demonstrates that a trier of fact could conceivably determine that Dr. Berger's failure to diagnose plaintiff's condition or make appropriate referrals could or might have been the proximate cause of plaintiff's injury, *i.e.*, the metastasis of the malignant schwannoma to lymph nodes in her groin.

Regarding defendant HPOC, we find, as a matter of law, the treatment and medical advice provided by Dr. Arnold Cohn, an associate of HOPC, on February 14, 1983, did not proximately cause plaintiff's injury. There is no evidence in the record to support a contrary finding. Regarding the services rendered by Dr. Rosenzweig in October 1981, plaintiff points out that defendant HPOC is *not* charged with having failed to diagnose correctly the specific presence of a cancerous lump but with failing to detect a condition which should have alerted him to a problem which other experts would properly have diagnosed.

■■ Plaintiff's unrebutted testimony indicates the following. Dr. Rosenzweig failed to take a family history that would have indicated cancer in her family. He did not pay attention to the fact that plaintiff had had a mastectomy due to breast cancer. Dr. Rosenzweig did not indicate that plaintiff was to follow up with him after completing the ultrasound treatments; and plaintiff thought that he was "through" with her following the examination on October 13, 1981. He was aware that there was a lump in the area where plaintiff felt pain and that the X ray, which was negative, did not determine the nature of the growth. The fact that plaintiff did not take the prescribed ultrasound treatments does not necessarily negate her charge that Dr. Rosenzweig's failure to diagnose plaintiff's condition or make appropri-

ate referrals proximately caused her injury. We find that fair-minded persons could reasonably conclude that, having determined the absence of an orthopedic problem, Dr. Rosenzweig, at a minimum, should have referred plaintiff to an expert in another relevant medical discipline. Consequently, it is conceivable that a trier of fact could or might find that HPOC, through Dr. Rosenzweig, proximately caused the misdiagnosis of the malignant schwannoma which resulted in plaintiff's injury. The trial court erred in granting HPOC's motion for summary judgment which concerned the services provided by Dr. Rosenzweig.

For the reasons stated above, we reverse and remand this action for further proceedings consistent with this opinion.

Reversed and remanded with directions.

UNVERZAGT, P.J., and NASH, J., concur.