Edward COLBERT, Individually and as Personal Representative of the Estate of Susan Colbert, Appellant,

v.

GEORGETOWN UNIVERSITY, d/b/a Georgetown University Hospital, and Thomas C. Lee, M.D., Appellees.

No. 91–CV–100.

District of Columbia Court of Appeals.

Argued En Banc Feb. 14, 1994.
Decided May 5, 1994.

Barry J. Nace, Washington, DC, for appellant.

---

Carolyn H. Williams, with whom David C. Kiernan and Julie Gross Adelson, Washington, DC, were on the brief, for appellees.

Before FERREN, Acting Chief Judge [*], and TERRY, STEADMAN, SCHWELB, FARRELL, WAGNER and KING, Associate Judges.

SCHWELB, Associate Judge:

In this medical malpractice case, the trial judge granted summary judgment in favor of the defendants, Georgetown University Hospital and Thomas C. Lee, M.D., holding, *inter alia,* that the action was barred by the District's three-year statute of limitations. A divided panel of this court reversed the judgment. *Colbert v. Georgetown University,* 623 A.2d 1244 (D.C.1993) (*Colbert I*). We granted the defendants' petition for rehearing en banc, and now affirm the decision of the trial court.

## I.

### THE FACTS [1]

In July 1982 Susan Colbert felt a lump in her left breast. She went to see her gynecologist, who referred her to an oncologist, Dr. Stanley Kirson. Although a mammogram revealed no evidence of malignancy, a biopsy on August 9 established that the lump was cancerous. Dr. Kirson urged Mrs. Colbert to have the breast removed by a modified radical mastectomy.

On August 13, Mrs. Colbert and her husband, Edward Colbert, met with Dr. Thomas Lee, one of the surgeons recommended by Dr. Kirson and a full-time employee of Georgetown Hospital. Dr. Lee suggested a lumpectomy as an alternative treatment option. He told the Colberts that a lumpectomy was cosmetically more attractive than a mastectomy, and that studies in Europe had shown that, when coupled with radiation

treatments afterwards, it was as effective as a mastectomy at removing cancerous cells from the body. The Colberts agreed to the proposed lumpectomy and scheduled the procedure with Dr. Lee.

On August 19, Dr. Lee performed a lumpectomy on Mrs. Colbert's left breast. At the same time, he removed several of her left axillary lymph nodes. When one of the nodes tested positive for cancerous cells, he set up a program of systemic chemotherapy. Mrs. Colbert began receiving chemotherapy treatments under the direction of Dr. Richard Goldberg on September 7.

A couple of weeks later, Mrs. Colbert felt more lumps in her left breast. She tried at that time to obtain another appointment with Dr. Lee, but she was unsuccessful, so she brought the lumps to Dr. Goldberg's attention. On September 28, Dr. Goldberg asked Dr. Patrick Byrne to examine the lumps in Mrs. Colbert's breast. Dr. Byrne arranged for two biopsies to be performed on October 4 and 5.

When these biopsies disclosed the continued presence of cancer in Mrs. Colbert's left breast, Dr. Lee told her that she needed a mastectomy. Mrs. Colbert then asked Dr. Lee if the delay in performing the mastectomy had caused any increased risk. According to her answer to an interrogatory, Dr. Lee replied that "the delay caused enhanced risk of a very high nature." Dr. Lee performed the mastectomy on Mrs. Colbert's left breast on October 21.

Shortly after the mastectomy, Dr. Lee met with Mr. Colbert. At that meeting, according to Mr. Colbert's deposition, Dr. Lee "said that it took him a long time to do the operation because in his entire career he had never seen so much tumor mass." Dr. Lee also said that Mrs. Colbert's chances of survival had decreased from ninety percent to ten percent, and he admitted to Mr. Colbert that he had done "the wrong operation" in

[*] Judge FERREN was an *Associate Judge* of this court at the time of argument. His status changed to *Acting Chief Judge* on March 18, 1994. Former *Chief Judge* ROGERS was a member of the en banc court that heard oral argument in this case, but resigned from the court on March 18, 1994.

[1] Our factual recitation is taken from and substantially identical to Judge Terry's statement of the facts for the majority in *Colbert I,* 623 A.2d at 1246–48. It is based on the depositions, answers to interrogatories and other materials presented by the Colberts in opposition to the defendants' motion for summary judgment.

August, *i.e.*, when he performed the lumpectomy instead of the mastectomy recommended by Dr. Kirson. Mr. Colbert also stated in his deposition that Dr. Lee said he had "forgotten" that a lumpectomy was not the proper procedure for a patient with multicentric disease, such as Mrs. Colbert.

On the following day, Mr. Colbert met with Dr. Philip Schein, the chief of the medical oncology division at Georgetown University Hospital, along with other hospital personnel. Dr. Schein told Mr. Colbert that Mrs. Colbert would need an "aggressive" treatment program, combining radiation with chemotherapy. This was "not the usual" treatment after a mastectomy, he said, but because of the extensive growth of the tumor, it was called for in Mrs. Colbert's case. The treatment began very soon thereafter.

Mr. Colbert testified at his deposition that on October 25, 1982, he was in his wife's hospital room when Dr. Goldberg came in. The doctor told them both that he had examined Mrs. Colbert's liver scan and found that the cancer had spread to her liver.[2] He said that Mrs. Colbert should "go home and get [her] affairs in order because [she was] going to die," apparently in the immediate future. After more sophisticated tests were run, however, other doctors determined that Dr. Goldberg's reading of the liver scan was in error. There was no liver metastasis, and Dr. Goldberg's conclusion that Mrs. Colbert was "going to die" immediately was also wrong. Dr. Goldberg was then taken off the case.

Mrs. Colbert claimed to have suffered numerous hardships as a result of the chemotherapy and radiation treatment, including third-degree burns, loss of body function, premature menopause,[3] loss of hair, nausea, dizziness, weakness, a cracked bladder and resultant bleeding, blistering, and scars. In addition to these physical problems, Mrs. Colbert became extremely depressed and be-

gan seeing a psychiatrist for counseling and treatment.

On March 7, 1983, Mrs. Colbert had a prophylactic mastectomy performed on her right breast. This operation was recommended by the doctors at Georgetown, because they were virtually certain that the cancer would spread to the right breast as a result of what they had found in the left breast. The Colberts, however, no longer wanted Dr. Lee or anybody else at Georgetown to operate on Mrs. Colbert, and the operation was performed at Sibley Memorial Hospital. In his deposition Mr. Colbert testified that, "based on what the physicians [at Georgetown] told me," he believed the prophylactic mastectomy of the right breast would not have been necessary if a mastectomy of the left breast had been performed in August 1982 instead of the lumpectomy.[4]

After the first mastectomy, Dr. Lee and others told the Colberts that they were not sure whether the cancer would recur. Dr. Lee specifically told Mr. Colbert that his wife "may never have a recurrence." Nevertheless, the Colberts received another scare in late 1984 or early 1985, when they were told that the cancer had metastasized to her spine. This proved once again to be a false alarm, for further tests revealed no evidence that the cancer had spread.

In late August 1986, Mrs. Colbert began to experience some pain in her lower back. On August 30, she went to see her regular internist, who sent her to Sibley Hospital to have x-rays taken of her back. When the x-rays revealed some evidence of abnormality, the internist told the Colberts that there was a possibility that the cancer had spread. He recommended that Mrs. Colbert see an oncologist for further testing. Additional tests revealed that Mrs. Colbert's cancer had indeed metastasized to her spine and hip. Beginning in September, 1986, Mrs. Colbert received treatment for the cancer in her spine, hip and elsewhere.

---

**2.** On this point he disagreed with Dr. Lee, who had read the liver scan as showing "no metastasis." Dr. Goldberg said, "I know that's Dr. Lee's position, but I disagree with him."

**3.** Mrs. Colbert was thirty-five years old at the time.

**4.** Edward Colbert also testified at his deposition that in late 1982 or early 1983, he and his wife had discussed on numerous occasions Dr. Lee's admission that he had performed the wrong operation and the possibility of suing Dr. Lee and Georgetown Hospital for medical malpractice.

Mr. and Mrs. Colbert filed this action on August 31, 1989.[5] After the close of discovery, Dr. Lee and Georgetown University filed two separate motions for summary judgment. In one of the motions, the defendants asserted that the Colberts' claim was barred because it was filed after the expiration of the three-year statute of limitations. In the other motion, they contended that the various malpractice allegations must fail because they were not supported by any testimony or affidavit from a medical expert. The trial judge granted the second motion as to all claims except that involving the defendant's alleged failure to warn the Colberts of the risks involved in the lumpectomy procedure initially performed on Mrs. Colbert.[6] That exception was moot, however, because the judge also granted the first motion based on the statute of limitations. From the judgment entered for Georgetown and Dr. Lee, the Colberts noted this appeal.

Susan Colbert died on January 4, 1992. Her husband was substituted for her as an appellant in his capacity as the personal representative of her estate. He is also, of course, an appellant in his own right.

## II.

## LEGAL DISCUSSION

In order to be entitled to summary judgment, Georgetown and Dr. Lee must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Super.Ct.Civ.R. 56(c); *Clyburn v. 1411 K Street Limited Partnership*, 628 A.2d 1015, 1017 (D.C.1993).

The record is viewed in the light most favorable to the party opposing the motion. *Graff v. Malawer*, 592 A.2d 1038, 1040 (D.C.1991). On appeal, we must assess the record independently, but the substantive standard applied is the same as that utilized by the trial court. *Northbrook Ins. Co. v. United Servs. Auto Ass'n*, 626 A.2d 915, 917 (D.C.1993).

■ In the District of Columbia, an action for medical malpractice must be brought within three years "from the time the right to maintain the action accrues." D.C.Code § 12–301(8) (1989). If, as a matter of law, the Colberts' right of action accrued in 1982 (when Dr. Lee allegedly advised the Colberts that he had performed the wrong operation and that Mrs. Colbert's chances of survival had decreased from ninety percent to ten percent) or even in 1983 (when Mrs. Colbert's right breast was removed, allegedly as a result of Dr. Lee's admitted negligence), then the complaint was necessarily time-barred. If, on the other hand, a genuine issue of material fact arises as to whether the Colberts' right of action accrued in 1986 (when cancer was found in Mrs. Colbert's spine and hip) rather than in 1982 or 1983, then the defendants were not entitled to summary judgment.[7]

■ Where the fact of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs. *Burns v. Bell*, 409 A.2d 614, 615 (D.C.1979); *Shehyn v. District of Columbia*, 392 A.2d 1008, 1013 (D.C.1978). Where the relationship between the fact of injury and the alleged tortious conduct may be obscure, we determine when

5. Mrs. Colbert sought damages for the alleged malpractice of Dr. Lee and other Georgetown physicians; Mr. Colbert sought damages for loss of consortium.

6. *See Abbey v. Jackson*, 483 A.2d 330, 333 (D.C. 1984) (expert testimony is not required to establish a *prima facie* case on the issue of informed consent). In light of our disposition of the limitations issue, we do not reach the merits of the defendants' contention that they were entitled to summary judgment as a result of the Colberts' failure to present expert testimony.

7. The Colberts acknowledge that they were advised on August 30, 1986, that the cancer had metastasized to Mrs. Colbert's spine and hip. This suit was brought three years and one day

later. Georgetown and Dr. Lee contend that the action was instituted a day late and is thus time-barred.

Both Colberts stated in a joint affidavit filed in opposition to the motion for summary judgment that they did not credit the warning that the disease had spread because they had previously received two diagnoses of metastasis which had proved to be incorrect. Mr. Colbert contends that this affidavit raises a genuine issue of material fact as to whether the Colberts should have known of the metastasis, and that summary judgment was therefore inappropriate. Because we affirm on other grounds, we do not reach this issue.

the statute of limitations begins to run by applying the "discovery rule." *Bussineau v. President & Directors of Georgetown College*, 518 A.2d 423, 425–26 (D.C.1986). Under that rule, a medical malpractice claim does not accrue until the patient has "discovered or reasonably should have discovered all of the essential elements of her possible cause of action, *i.e.*, duty, breach, causation and damages." *Id.* at 434 (quoting *Ohler v. Tacoma General Hospital*, 92 Wash.2d 507, 598 P.2d 1358, 1360 (1979) (en banc); *see also Knight v. Furlow*, 553 A.2d 1232, 1236 (D.C.1989). Accordingly, Mrs. Colbert's right of action did not accrue until she knew or should have known that she had suffered injury as a result of the defendants' negligence.

■ The discovery rule does not, however, permit a plaintiff who has information regarding a defendant's negligence, and who knows that she has been significantly injured, to defer institution of suit and wait and see whether additional injuries come to light. As this court has explained in the context of an analogous action for legal malpractice,

> [i]t is not necessary that all or even the greater part of the damages have to occur before the cause of action arises. *Any appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action* upon which the client may sue.

*Knight, supra*, 553 A.2d at 1235 (emphasis added) (quoting *Bell v. Hummel & Pappas*, 136 Cal.App.3d 1009, 186 Cal.Rptr. 688, 694 (Dist.1982)). We went on to note in *Knight* that "[t]he key issue is client knowledge of *some injury*, its cause, and related wrongdoing." 553 A.2d at 1236 (emphasis added). Similarly, in *Baker v. A.H. Robins Co.*, 613 F.Supp. 994 (D.D.C.1985), the court, applying District of Columbia law in a product liability case, reasoned (correctly, in our view) that

> [t]he fact that [the plaintiff] did not then comprehend the full extent of *all* possible sequelae does not matter, for the law of limitations requires only that she have inquiry notice of the existence of a *cause of action* for personal injury.

613 F.Supp. at 996 (emphasis in original; citations omitted). Put another way, "one who knows that [s]he has suffered from medical malpractice may not postpone an action until the full extent of [her] damage is ascertained." *Hulver v. United States*, 562 F.2d 1132, 1137 (8th Cir.1977) (citations omitted), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978); *see also Toal v. United States*, 438 F.2d 222, 225 (2d Cir.1971).

In the present case, as the trial judge explained in his memorandum opinion granting summary judgment, the Colberts demonstrably were placed in 1982 at least on inquiry notice, *see Baker, supra*, 613 F.Supp. at 996, of the probability of metastasis.[8] Moreover, by 1982, and to an even greater extent by 1983, Mrs. Colbert had suffered "appreciable and actual harm," *Knight, supra*, 553 A.2d at 1235, for the metastasis which was discovered in 1986 was not by any means the only injury which the Colberts claimed to have incurred as a result of Dr. Lee's and Georgetown's negligence. As the trial judge explained,

> all of the other injuries that plaintiffs allege they sustained as a result of defendants' negligence were sustained and occurred in 1982 and 1983. These injuries as elaborated by Ms. Colbert in her answers to interrogatories are as follows:
>
> > Third degree burns resulting from the otherwise unnecessary joint application

8. The judge succinctly summarized the record with regard to this issue as follows:

> In October, 1982, Dr. Lee informed Ms. Colbert that she needed a mastectomy because the results of the biopsy showed "suspicious cells." At that time, Ms. Colbert asked him what the result of the delay had been or would be, and Dr. Lee told her that the delay [in performing the mastectomy] caused enhanced risk of a very high nature. On October 21, 1982, after Dr. Lee performed a mastectomy of Ms. Colbert's left breast, Dr. Lee spoke with Mr. Colbert and admitted that he (Dr. Lee) had per-

formed the wrong operation, and that Ms. Colbert's chances of surviving had been greatly reduced. Before the operation, Dr. Lee told the Colberts that Ms. Colbert had a 90% chance of survival; after the mastectomy Dr. Lee told Edward Colbert that Ms. Colbert had a 10% chance of survival. Basically, Dr. Lee said she was going to die. At this point, plaintiffs were made aware of Susan's injury (deprivation of her chances of recovery) and that Dr. Lee's conduct constituted possible malpractice. Memorandum Opinion at 9. (Citations to record omitted).

of radiation and chemotherapy. Loss of body function and pain associated with otherwise unnecessary radiation therapy. Need for prophylactic mastectomy on the right side [9].... Additional chemotherapeutic and hormone treatment. Continued radiation to control pain and spread of disease. Emotional trauma to self, husband and children.

(Citations to record omitted). Mr. Colbert also testified at his deposition that in 1982–83 Ms. Colbert went through premature menopause, suffered nausea, dizziness and loss of hair, her bladder cracked and bled and she became extremely depressed.

Memorandum Opinion at 12.

As their attorney correctly acknowledged at oral argument, the Colberts could have filed suit against the defendants in 1982 or 1983, for Mrs. Colbert had suffered substantial injury by then.[10] Counsel likewise acknowledged that the Colberts could have included in their complaint a claim based on the probability of metastasis and of hastened death. *See Wilson v. Johns–Manville Sales Corp.,* 221 U.S.App.D.C. 337, 345, 684 F.2d 111, 119 (1982) (plaintiff is entitled to recovery of future consequences if it is more likely than not that such consequences will occur). Counsel contended, however, that the Colberts had the right, at their option, either to bring suit within three years of 1982 or 1983 and seek recovery for future consequences, or to wait to determine if the anticipated metastasis in fact occurred, and, if it did, to sue within three years of that occurrence for damages incurred as a result of the actual metastasis. Essentially, the Colberts ask us to treat the actual metastasis as a new injury giving rise to a new cause of action, even though they acknowledge that they could have sought damages for probable metastasis, as well as for Mrs. Colbert's other cancer-related injuries, as early as 1982. We know of no precedent for the position that a

plaintiff whose action has accrued, and who has already suffered grievous injury, may defer suit until further complications develop.

The Colberts rely on a number of authorities holding, as described in *Colbert I,* 623 A.2d at 1249, that "a patient's awareness of metastasis is the relevant trigger for purposes of the statute of limitations." *See, e.g., Johnson v. Mullee,* 385 So.2d 1038, 1040 (Fla. Dist.Ct.App.1980), *review denied,* 392 So.2d 1377 (Fla.1981); *Marciniak v. O'Connor,* 102 Ill.App.3d 381, 58 Ill.Dec. 504, 507, 430 N.E.2d 536, 539 (1981). These cases are unlike the present one, however, for in each of them, the metastasis of the cancer was apparently the only injury for which the plaintiffs were seeking to recover. Allowing the institution of suit on the basis of the discovery of the metastasis would not have involved splitting the plaintiff's right of action into two parts. In *Johnson, supra,* for example, the Florida appellate court stated that

[a]t the time the radical mastectomy was performed, she had no cause of action against appellee doctor because *there was no evidence that his alleged negligence had resulted in any harm to her.* It was only in February 1975, when the cancer appeared in other parts of her body, that she discovered her cause of action.

385 So.2d at 1040 (emphasis added). In addition, none of these decisions involved a situation in which the plaintiff had been informed, at a much earlier date, that metastasis and death were all but certain, and there had thus been no prior opportunity to sue for anticipated metastasis.

In the present case, on the other hand, the Colberts were told in 1982 that the probability of metastasis and early death had increased from ten percent to ninety percent as a result of the defendants' negligence. Moreover, Mrs. Colbert had complained,

9. The plaintiffs claimed, as we have noted, that the removal of Mrs. Colbert's right breast would have been unnecessary if Dr. Lee had performed the correct operation in the first place.

10. In their complaint, the Colberts sought damages not only for the metastasis but also for the injuries suffered in 1982 or 1983, including, *inter alia,* radiation burns, the loss of Mrs. Colbert's

right breast, pain and suffering, and emotional distress. Their counsel conceded at argument, however, that all claims for 1982 and 1983 injuries were time-barred. *Cf. Colbert I, supra,* 623 A.2d at 1256 (dissenting opinion) (referring to counsel's "virtual" concession before the division).

more than six years before suit was filed, of major harm, including the loss of her right breast. All of this early suffering had also allegedly been proximately caused by Dr. Lee's and Georgetown's malpractice.

The Colberts' reliance on *Wilson, supra,* 221 U.S.App.D.C. 337, 684 F.2d 111, is misplaced. In that case, the plaintiff, who had been exposed to asbestos products, developed mild asbestosis in 1973 and cancer in 1978. He died in 1978, and his widow filed suit for wrongful death in 1979. Characterizing the question before it as being whether the "manifestation of any asbestos-related disease (in this case asbestosis) triggers the running of all separate, distinct, and later-manifested diseases ... engendered by the same asbestos exposure," *id.* at 338, 684 F.2d at 112, and noting that asbestosis "is not a cancerous process," *id.* at 339 n. 3, 684 F.2d at 113 n. 3, the court held that the one-year statute of limitations began to run with the discovery of the cancer in 1978, rather than with the appearance of mild asbestosis in 1973. The court reasoned that the new, different, and more serious disease constituted a separate injury which could not have been predicted in 1973, and that Wilson therefore could not have sought cancer-related damages at that time.[11] In the present case, by contrast, Mrs. Colbert had, by 1983, already endured substantial suffering from *the very disease (cancer)* that later further metasta-

sized, and she and her husband had been apprised of a ninety percent probability of metastasis and death. If they succeeded in proving what they alleged, any argument on behalf of the defense that the claimed damages as to probable metastasis were too speculative would have been demonstrably unavailing. Unlike *Wilson,* this is a case of a single, progressive disease.

The logic of the Colberts' position in this case inexorably leads to the conclusion that Mrs. Colbert, knowing in 1982 that it was 90% probable that her cancer would metastasize, could nevertheless sue in 1983 for burns, loss of body function, pain, a prophylactic mastectomy, emotional trauma, premature nausea, dizziness, hair loss, a cracked bladder, and severe depression, leave out of her suit any claim for probable metastasis, and then bring a separate suit in connection with the metastasis in 1989 three years after the ninety percent probability had become a *fait accompli.* No court, to the best of our knowledge, has ever permitted a plaintiff to split such claims in this way.[12]

The Colberts' position knows no limiting principle. Apparently, if metastasis had occurred in 1994, they would claim the right to sue in 1997, fifteen years after the events in question. Although, as the trial judge noted, "this case is a difficult one, evoking much sympathy," we are compelled to reject the

11. The court pointed out in *Wilson* that only "15% of asbestosis sufferers later contract pleural mesothelioma and 12% contract peritoneal mesothelioma," so that

> it is altogether likely that had Wilson, upon receiving the "mild asbestosis" diagnosis, sought to recover for a cancer which might (or might not) develop, Johns–Manville would have argued forcibly that the probability of such a development was far less than 50%, and was therefore too speculative, conjectural, [and] uncertain to support a damage award.

*Id.* at 346 & n. 45, 684 F.2d at 120 & n. 45.

12. Counsel for the Colberts argues that it would be unreasonable to require Mrs. Colbert to sue, say, in 1985, when her condition was good and when the alleged ninety percent prospect of metastasis had not materialized. Their point has some appeal; patients should not be rushed into suing their doctors when most of the dreaded harm may never come about. Counsel's position might be more persuasive if metastasis were the only injury claimed, and if an apparently healthy

plaintiff were compelled to come to court predicting her own doom and to cross swords with her physician before any harm has actually come to her as a result of the physician's negligence. *But cf. Wilson, supra.* That, however, is not this case; Mrs. Colbert had already suffered grievous injury, allegedly on account of the defendant's malpractice, more than six years before the action was brought. It was when those injuries were suffered that the limitations clock began to tick, and the Colberts, who were also aware since 1982 of the ninety percent probability of metastasis, simply waited too long to sue.

Mr. Colbert also contends that summary judgment was inappropriate because the effect of Dr. Lee's statement that Mrs. Colbert's chances of survival had dropped to ten percent was dissipated by the lack of metastasis through 1985, or at least that a reasonable jury could so find. Even if we assume, solely for the sake of argument, that this proposition is correct, the lack of metastasis until 1986 could not wipe out the injuries which Mrs. Colbert had *already* suffered in 1982 and 1983.

Colberts' invitation to expand the discovery rule to reach this case. Accordingly, the judgment of the trial court is hereby

*Affirmed.*

TERRY, Associate Judge, dissenting:

I cannot agree with the majority's analysis of this case. In my view, there is a material issue of fact affecting the application of the discovery rule, and thus the case should not have been decided on summary judgment.

In the District of Columbia, an action for medical malpractice must be brought within three years "from the time the right to maintain the action accrues." D.C.Code § 12–301(8) (1989). In deciding when a cause of action for medical malpractice accrues for purposes of the statute of limitations, this court has applied the "discovery rule." *Burns v. Bell,* 409 A.2d 614, 617 (D.C.1979). Under that rule, a cause of action does not accrue until the plaintiff knows, or by the exercise of reasonable diligence should know, of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *Bussineau v. President & Directors of Georgetown College,* 518 A.2d 423, 425 (D.C.1986).

The application of the discovery rule in this case depends on the definition of "injury." Mr. Colbert contends that the metastasis of his wife's cancer is the relevant injury. He asserts that he and his wife were not aware of any injury until they learned definitively that Mrs. Colbert's cancer had metastasized to her spine and hip. The Colberts admitted that they were aware of Dr. Lee's negligence in not performing a mastectomy in August of 1982, but they maintained below, and Mr. Colbert maintains on appeal, that they did not believe that the failure to perform a mastectomy in August of 1982 caused any ultimate harm to Mrs. Colbert until they discovered the metastasis in September of 1986. The hospital and Dr. Lee claim that the relevant injury for purposes of the discovery rule was the initial breast can-

cer. They assert that the Colberts were aware of that injury and of the defendants' negligence in 1982. Their argument assumes that the metastasis of Mrs. Colbert's cancer was merely a manifestation of that initial, and controlling, injury.

The plaintiffs' state of mind is the paramount factor in this court's definition of the relevant injury for purposes of the discovery rule. We have held that, under the discovery rule, "[t]he key issue is [the plaintiff's] knowledge of some injury, its cause, and related wrongdoing." *Knight v. Furlow,* 553 A.2d 1232, 1236 (D.C.1989), citing *Bussineau, supra,* 518 A.2d at 425. Our cases show that we tend to look askance at trial court rulings that purport to decide such an issue on motions for summary judgment. For example, in *Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192 (D.C.1984), we concluded that the relevant inquiry was "whether genuine issues of material fact exist as to when appellant knew, or with reasonable diligence could have known, of the ... defects for which he seeks damages." *Id.* at 1204. We held that "this determination cannot be made in a summary manner.... [Whether] appellant knew or should have known of the alleged defects for more than three years at the time the complaint was filed ... is a question to be decided by the trier of fact." *Id.* (citations omitted).[1]

According to the reasoning of *Ehrenhaft* and *Knight,* the outcome of this case depends on what the Colberts believed (or reasonably should have believed) as to the potential metastasis of Mrs. Colbert's cancer. If the Colberts were reasonable in their belief that they were not injured by the negligence of Dr. Lee until they discovered the metastasis of the cancer in September of 1986, then the cause of action did not accrue until September of 1986. If that belief was not reasonable, then their awareness of injury occurred, and their cause of action accrued, much earlier.[2]

---

1. "Summary judgment is often inappropriate where state of mind is crucial to the ultimate factual issue." *Attorney General v. Irish People, Inc.,* 254 U.S.App.D.C. 229, 233, 796 F.2d 520, 524 (1986) (citations omitted); *see Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491–92, 7 L.Ed.2d 458 (1962).

2. In a case factually similar to the case at bar, the Tennessee Court of Appeals held that there was a genuine issue of material fact as to when the plaintiff's cause of action for malpractice accrued under the discovery rule. "The issue before us is not whether [the plaintiff] knew that

In other jurisdictions which apply the discovery rule, a majority of courts confronted with the issue presented here have held that a patient's awareness of metastasis is the relevant trigger for purposes of the statute of limitations. A Florida appellate court, for instance, reversed a trial court's grant of summary judgment on statute of limitations grounds and held that the plaintiff's assertion that she did not believe she had been injured by the defendants' failure to diagnose her cancer until the discovery of metastasis presented a genuine issue of material fact:

> At the time the radical mastectomy was performed, she had no cause of action against appellee doctor because there was no evidence that his alleged negligence had resulted in any harm to her. It was only in February 1975, when the cancer appeared in other parts of her body, that she discovered her cause of action.

*Johnson v. Mullee*, 385 So.2d 1038, 1040 (Fla. Dist.Ct.App.1980), *review denied*, 392 So.2d 1377 (Fla.1981). The Illinois Appellate Court has similarly held that the reasonableness *vel non* of the plaintiff's belief that she had not been injured until she discovered the metastasis of her cancer was a genuine issue of material fact. *Marciniak v. O'Connor*, 102 Ill.App.3d 381, 386–87, 58 Ill.Dec. 504, 507, 430 N.E.2d 536, 539 (1981); *see also Catz v. Rubenstein*, 201 Conn. 39, 49, 513 A.2d 98, 103 (1986); *Jennings v. Brabson, supra* note 2. *But see Silverman v. Lathrop*, 168 N.J.Super. 333, 403 A.2d 18 (1979) (plaintiff's cause of action for medical malpractice accrued at the time he discovered the doctor's negligence; upon making that discovery, plaintiff had a duty to investigate whether melanoma spot had metastasized). The majority rule is consistent with District of Columbia case law, specifically with *Ehrenhaft*, *Bussineau*, and *Knight*, and I would adopt it here for the District of Columbia.

In defining "injury" for purposes of the discovery rule, several courts have explicitly recognized that the metastasis of cancer gives rise to a cause of action distinct from that stemming from the original cancerous injury. The Supreme Court of Arizona has said that "[w]here a medical malpractice claim is based on a misdiagnosis or a failure to diagnose a condition ... the 'injury' is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment." *DeBoer v. Brown*, 138 Ariz. 168, 170, 673 P.2d 912, 914 (1983) (citations omitted). In reversing a trial court's grant of summary judgment in a medical malpractice case, the Illinois Appellate Court defined the relevant injury for purposes of the discovery rule as the metastasis of the original cancer: "The evidence adduced primarily through affidavits and depositions indicates a disputed material fact as to when plaintiff knew or, through use of reasonable diligence, should have known of *her injury, the metastasis of the malignant schwannoma to lymph nodes in her groin.*" *Kaplan v. Berger*, 184 Ill. App.3d 224, 231–32, 132 Ill.Dec. 461, 466, 539 N.E.2d 1267, 1272 (1989) (emphasis added); *see also Whitaker v. Zirkle*, 188 Ga.App. 706, 706–08, 374 S.E.2d 106, 108 (1988) ("The injury complained of is the subsequent metastasis of cancerous cells"). In each of these cases, the plaintiff had discovered both the presence of cancer and the negligence of her doctor long before she discovered that the cancer had metastasized. The plaintiff's assertion that it was the discovery of metastasis, rather than the original diagnosis of cancer, that triggered the statute of limitations was viewed to be reasonable enough for jury consideration in each instance.

The case at bar follows the same pattern. The Colberts admitted that they discovered Dr. Lee's negligence in 1982. They asserted, however, that they did not discover that his negligence *caused a compensable injury*— the second factor that starts the clock running under *Bussineau*—until the ultimate diagnosis of metastasis in 1986. The affidavits of Mr. and Mrs. Colbert, Mrs. Colbert's answers to interrogatories, and Mr. Colbert's deposition testimony all reflect their belief that Mrs. Colbert had at least a fair possibili-

---

she had cancer in July 1987; she admits to having this knowledge. The larger issue is whether she reasonably should have known that the condition would metastasize. If so, her ac-

tion is barred, otherwise it is not." *Jennings v. Brabson*, No. 1402, 1991 WL 50209, *2, 1991 Tenn.App. LEXIS 241, *4 (Tenn.Ct.App. April 10, 1991).

ty of full recovery until she learned of the metastasis. The Colberts' belief that they had not been injured until the manifestation of metastasis was further supported by the evidence that the doctors had consistently told the Colberts that the cancer might be forever cured.[3]

The defendants' assertion that the Colberts were aware of the spread of Mrs. Colbert's cancer before September of 1986 ignores several important facts. It is certainly true that the Colberts were told at least twice before September of 1986 that the cancer had metastasized. But each of these instances ultimately proved to be a false alarm. The record indicates that the presence of metastatic cancer was not conclusively determined until September 2 or 3, 1986;[4] every other supposed discovery of metastasis was tentative or preliminary and was later refuted. Given the substantial possibility that breast cancer will metastasize and the relative frequency of the false alarms, the Colberts' belief that Mrs. Colbert was not injured until the ultimate diagnosis may not seem reasonable to a jury. But that belief at least presents an issue of material fact which a jury should be allowed to resolve.[5]

There are additional reasons to view the Colberts' discovery of metastatic cancer as a clock-starting injury for purposes of the statute of limitations. First, *Ehrenhaft* and other cases [6] make clear that the plaintiffs' interest in the protection afforded by the discovery rule is more compelling than the defendants' interest in not having to deal with stale claims. The resulting obligation to defend which rests on the defendant is "somewhat tempered by the fact that the burden of proof remains upon the plaintiff." *Ehrenhaft, supra,* 483 A.2d at 1202 (citation omitted). Moreover, it is well recognized that statutes of limitations are merely "statutes of repose," which do not bestow any fundamental right on defendants. Rather, they "find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles." *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). Such statutes can and do remove valid claims from judicial consideration and prevent injured plaintiffs from being compensated for their injuries. Thus, in the application of any statute of limitations, it is the plaintiff's fundamental interest in the adjudication of a meritorious claim which must be balanced against the defendant's interest in repose.

---

3. The disparity of knowledge between patients and their doctors is one of the main reasons why this court has adopted the discovery rule in medical malpractice cases. "To require a patient to scrutinize to a fine degree the advice given by a treating physician, at the risk of losing his right to legal redress, seems unwise." *Burns v. Bell, supra,* 409 A.2d at 617.

4. Appellees assert that the metastasis was conclusively established no later than August 30, 1986. On that date, Mrs. Colbert's internist did inform the Colberts that x-rays of Mrs. Colbert's back were abnormal and suggested the possibility of metastasis—but only a possibility. The internist also recommended further tests, which were not conducted until September 2 or 3. It was those tests that finally confirmed the metastasis of Mrs. Colbert's breast cancer to her hip and spine.

The trial court did not decide whether the preliminary results of the August 30 x-rays satisfied the discovery rule, since it rested its grant of summary judgment on the conclusion that the relevant discovery occurred in 1982. I see no need, however, to remand the case for a specific ruling on the August 30 conversation between Mrs. Colbert and her internist, because I am satisfied that the Colberts' assertion that they did not conclusively discover metastatic cancer until several days later is clearly reasonable enough to raise a genuine issue of fact.

5. Appellees also assert that the Colberts could have sued for malpractice in 1982. The availability of an earlier suit may help the jury to determine whether the Colberts' belief that no injury had occurred was reasonable. It does not conclusively determine when their cause of action accrued, however, because the relevant focus is on the Colberts' state of mind. Even assuming that the Colberts could have brought this action in 1982, the apparent fact that Mrs. Colbert had fully recovered (which only later turned out to be untrue) may well have led them to believe they had no viable claim until they discovered that the cancer had metastasized. The possibility of an earlier suit does not make such a belief unreasonable. *See Abboud v. Viscomi,* 111 N.J. 56, 64–66, 543 A.2d 29, 33 (1988).

6. *E.g., Wilson v. Johns–Manville Sales Corp.,* 221 U.S.App.D.C. 337, 684 F.2d 111 (1982); *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983); *Larson v. Johns–Manville Sales Corp.,* 427 Mich. 301, 399 N.W.2d 1 (1986).

A holding that the discovery of metastatic cancer can start the running of the statute of limitations would also obviate the filing of a speculative lawsuit whenever a patient discovers any form of cancer. In *Ehrenhaft* we rested our holding in part on "the interests of judicial economy," concerned that our failure to apply the discovery rule to cases involving latent construction defects would "encourage litigation in the first instance, rather than as a last resort." 483 A.2d at 1203 (citations omitted). The United States Court of Appeals in *Wilson, supra* note 6, focused on this same risk in holding that the "manifestation of any asbestos-related disease" does not trigger the running of the statute of limitations on "a separate and distinct disease" caused by the same asbestos exposure "until *that* disease becomes manifest." 221 U.S.App.D.C. at 338, 684 F.2d at 112 (emphasis added). The court noted that if Mr. Wilson had just one indivisible cause of action for all potential consequences of his exposure to asbestos which accrued at the onset of any illness, he would have "a powerful incentive to go to court" at that time with a claim for future damages which would at best be speculative and uncertain, and hence unable to support a damage award. *Id.* at 345, 684 F.2d at 120. The incentive to file claims for unknowable future injuries "would result in the imposition of an unnecessary burden on the judicial system." *Pierce, supra* note 6, 296 Md. at 667, 464 A.2d at 1027.

The interests of judicial economy also favor reversal in the instant case. If the Colberts' cause of action for all potential injuries had accrued upon their discovery of Dr. Lee's negligence in 1982, they would have been obliged to file speculative claims for any injury which might someday afflict them. Such claims would be very likely to fail and leave the Colberts—or others like them— with no remedy for the metastasis allegedly caused by their doctor's initial negligence. Judicial time and effort would nevertheless be required to reject such claims. Allowing persons such as the Colberts to bring suit after they discover the metastasis of cancer would provide them with an effective remedy for their alleged injuries.

I would therefore hold that there is a genuine issue of material fact as to when the Colberts discovered their injury. In my view, the Colberts have submitted enough evidence to raise a genuine issue as to that critical question, precluding summary judgment based on the statute of limitations. Because the majority has a different view of the case, I respectfully dissent.